|        |   |
|--------|---|
| State  | : |
| v.     | : |
| Miguel Davis. | : |

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                              :

                    v.             :

Miguel Davis.                      :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.** The defendant, Miguel Davis, appeals from a judgment

of conviction entered after a jury found him guilty of three offenses: the murder of Dominique

Gay, in violation of G.L. 1956 §§ 11-23-1 and 11-23-2; using a firearm while committing a

crime of violence resulting in the death of Dominique Gay, in violation of G.L. 1956 § 11-47-

3.2; and carrying a pistol without a license, in violation of § 11-47-8(a). The trial justice

sentenced the defendant to two consecutive life sentences on counts 1 and 2 and one ten-year

sentence on count 5 to be served concurrently with the sentence on the first count.[1] The

defendant filed a timely notice of appeal. This case came before the Supreme Court for

argument on September 30, 2015. The defendant advances a host of arguments on appeal,

including two claims that the trial justice committed error when he instructed the jury, two

claims that the trial justice abused his discretion when he admitted prejudicial evidence, and one

---

[1] Counts 3 and 4 of the original indictment—assault of Dean Robinson with a dangerous weapon, to wit, a firearm, in violation of G.L. 1956 § 11-5-2, and using a firearm while in the commission of a crime of violence, to wit, an assault with a dangerous weapon against Dean Robinson, in violation of G.L. 1956 § 11-47-3.2(a)—were dismissed during trial.

claim that the trial justice erred when he denied his motion for a new trial. After a careful consideration of the defendant's arguments and a thorough review of the record, we affirm the judgments of conviction.

**1**

**Facts and Travel**

On March 20, 2009, Dominique Gay was shot and killed in broad daylight while he was walking with two friends, Dean Robinson and Wilson Andujar. Over three years later, defendant, Miguel Davis, was charged with that murder.

The history of the case is replete with conflict between Gay and Davis over the attention and affection of Crystal Dutra, a young woman who is the mother of Gay's child. When Dutra and Gay broke up, they agreed that each could see other people "as long as it wasn't anybody that [either Dutra or Gay] knew." Soon, Dutra began a relationship with defendant. Dutra testified that, in keeping with her agreement with Gay, she asked Davis whether he knew Gay, going so far as to point out several pictures of Gay in her home; however, each time Davis responded that he did not know Gay.

But at some point after Dutra began dating defendant, Gay told Dutra that he did know Davis. Dutra said that Gay told her that defendant was "one of the younger crowd that they hanged [sic] with." Indeed, Gay was able to describe defendant to her, describing his "long hair, braids and 'Loyalty' [tattooed] on his neck." Dutra rebuffed Gay and told him that he did not know Davis and that he was just jealous that she was dating someone else.

Unfortunately, that did not end the matter. Gay began to confront defendant repeatedly between the summer of 2007 and January 2009, tensions escalating drastically with each encounter. Those incidents included several occasions when Gay challenged defendant to engage in fisticuffs or when defendant was otherwise threatened by Gay. On one occasion,

- 2 -

Dutra allowed Gay to spend the night at her house, because he had nowhere else to go. When defendant also needed a place to stay that night, Dutra allowed Gay to stay, while defendant slept in his car outside her apartment. The bad blood continued even after defendant and Dutra ended their relationship and Dutra restarted an intermittent liaison with Gay.

Dutra moved to Boston for almost a year, but when she returned to Providence and resumed her relationship with Gay, she heard about several more incidents between Gay and defendant. Dutra said that Gay's challenges continued into the fall of 2008. She recalled that one day that Gay woke her up after he received a call from Robinson. Gay demanded that she drive him "really fast" to the Domino's Pizza on Broad Street. When they got there, Robinson was holding onto someone and Gay told Dutra to remain in the parking lot while he went inside. Dutra observed as Gay walked to the front of the Domino's and said that "he grabbed [a] kid and * * * lifted the kid in the air by his shirt." She then heard Gay say that he was not there for him, that "his beef was with Miguel." Gay then gave the young man a piece of paper with his phone number and told him to give it to defendant and have him call Gay.

Dutra admitted that she never saw defendant pursuing or looking for Gay and that, during each confrontation, defendant was either running from or avoiding Gay. She said that she understood that Gay was confronting defendant because "it was a respect thing * * * [Gay] said he wanted to fight him."

Another serious incident occurred in early January 2009, when defendant was with his then girlfriend, Lisa.[2] On that night, Lisa, defendant, and defendant's friend, Juan Arciliares, drove to Arciliares's house. After Lisa parked her car, defendant took her keys and her cell phone, and he and Arciliares went into the building, leaving her behind. Suddenly, Lisa heard

---

[2] We have assigned a pseudonym to defendant's former girlfriend to protect her privacy.

the windows of her car shatter from a gunshot, although she was unable to determine the direction from which the shots came. Lisa's rear windshield was smashed, there was a hole through the front windshield on the passenger side, and a bullet was lodged in the grille of the car. After the shots were fired, Lisa began screaming to defendant to bring her keys back so that she could leave. The defendant did not come down immediately, but responded through the window of the apartment, "It wasn't for you, it was for me."

Kevin Santiago, a somewhat younger friend who hung out with defendant and his associates, testified that he was in Arciliares's apartment playing video games when the shooting happened. Santiago testified that defendant told them that "Mike Stokes and Dean – and Dominique were shooting at him."

### The Eyewitness

The only eyewitness to Gay's murder who testified at trial was Wilson Andujar.[3] Andujar testified that, after moving away, he moved back to Providence toward the end of 2008. At that time, Andujar reconnected with old friends, but met Gay for the first time about a month after returning to Rhode Island. Andujar and Gay became friends; he said that the pair would see each other about two or three times each week.

Andujar testified that on the day of the murder, March 20, 2009, Gay showed up at his house that morning around 9 or 10 a.m., looking for a way to smoke some marijuana. They decided to go to a store to buy a cigar for that purpose and, on their way, Andujar and Gay decided to call on Robinson to see if he wished to join them. After picking up Robinson, the three friends walked to a gas station, bought a cigar, and then went to a restaurant. After they left the restaurant, the group decided to walk back to Robinson's house.

---

[3] Dean Robinson, who also was present when Gay was shot, was expected to testify at trial, but unexpectedly invoked his Fifth Amendment right against self-incrimination.

Andujar explained that they walked side-by-side with Andujar in the middle, Gay to his left, and Robinson to his right. Andujar testified that there was an alley behind a laundromat where a dumpster was located. As they approached the alley, he heard "a gravel noise" and then looked to his left and saw defendant standing beside the dumpster pointing a handgun at them. Almost immediately, Andujar said, "Right there where I looked, I heard the first shot. Right when I went to run, I slipped. That's right there, when I slipped [I] heard a second shot. I kept—I started to run." Andujar also testified, on cross-examination, that he saw a black handgun, but that he did not know whether the weapon was a revolver or what caliber it might have been.

Andujar further testified that the assailant was wearing a "hoodie" that covered part of his head but that the hood was not pulled all the way forward. The gunman also had a bandanna that covered part of his face, from the tip of his nose past his chin, so that the only portion of his face that Andujar could see was his hairline, his forehead, his eyes, and part of his nose. When asked if he was able to recognize the person holding the weapon, Andujar responded that it was Miguel Davis. He said that he recognized Davis because he knew him from 2006—three years prior to the shooting and seven years prior to trial—when they were in school together for "a couple weeks."[4] Andujar identified defendant in the courtroom as the man he had seen with the gun on March 20, 2009; however, when asked at what point he realized that it was Miguel Davis with the gun, Andujar testified that it was not immediate; it was not until later, when "it just * * * clicked in my head who I just saw."

After fleeing from the gunman, Andujar said, he looked over his left shoulder and saw Robinson being chased by another man, whom he eventually identified as Christopher "Ucci"

---

[4] Although Andujar testified that he knew defendant, he said that they were not friends and they did not talk to each other in school or hang out together.

Martinez. Andujar testified that Ucci was not the same person he saw with a gun, that Ucci did not have anything covering his face when he saw him pursuing Robinson, and that he was also wearing "a black hoodie."[5] When he did not hear any more gunshots, Andujar lay down on the ground and called 9-1-1.

Andujar soon came upon Robinson, who was crying, yelling, and saying, "They got him." From where they were standing, Andujar said, he could see Gay's body, lying on the sidewalk near the dumpster, and he began to cry himself.

Andujar and Robinson were brought to the police station to be questioned. Andujar said he was not cooperative and merely told the police "the simple fact that we got shot at, I didn't see nothing." When asked at trial if that was true, Andujar said no, that "I was just going by the so-called street code and I was * * * fearing for my life of what just happened" and that he feared that he "could be retaliated." He testified that he did not discuss the shooting with Robinson at the police station, but that they did discuss it at Gay's funeral. At that time, he said, he told Robinson that he had seen defendant shoot Gay.

Andujar left the state shortly after the shooting, determined, he said, to turn his life around. The next time Andujar saw or heard anything about his friend's murder was more than three years later, in September 2012, when a friend sent a Facebook message to him that said he should look at an accompanying link to a video clip. The video clip was a news report of a "break in the case," showing defendant in a courtroom being arraigned for the murder of

---

[5] The color of the hoodie that the gunman wore was not discussed until cross-examination during the following exchange:

"Q And you say that Ucci is wearing a black hoodie; right?
"A Correct.
   "* * *
"Q Same black hoodie you said you saw on the shooter; right?
"A Correct."

Dominique Gay. Soon after he viewed that video, Andujar was contacted by Robinson. Andujar and Robinson specifically discussed that defendant had been arrested for the murder of Gay.

Andujar then returned to Rhode Island at the request and expense of the Providence police, and he met with police and prosecutors. During that meeting, Andujar disclosed to the police, for the first time, that he had seen Davis shoot Gay. The police showed two photo arrays to Andujar. In the first six-photo array, Andujar identified a photo of Ucci and, in the second, he identified a picture of defendant.

### Forensic Evidence

During the trial, the state called Dr. Alexander Chirkov, who performed the autopsy on Dominique Gay. He testified that he found two bullet wounds in Gay's body and that both wounds were fatal. The state also called Providence Bureau of Criminal Information Det. Douglas Allin to testify about forensic evidence that had been found at the scene, including two cartridge casings and two full cartridges that had been found near the dumpster.

Robert A. Hathaway, an expert in firearm and toolmark examination at the Rhode Island State Crime Laboratory, testified about the forensic examination conducted on the spent casings. Hathaway observed that both were 9 mm Luger Winchester cartridge cases. Hathaway testified that it was his expert opinion that both rounds had been fired from the same weapon.

However, after analyzing the two lead projectiles extracted from Gay's body, Hathaway was unable to positively identify them as having been fired from the same weapon. Hathaway was, however, able to conclude, based on the weight and diameter of both projectiles, that the bullets would have been in the ".38 caliber class" of bullets. He further testified that that class would include such weapons as the .38 special, .38 S&W, 9 mm Luger, and .357 Magnum.

## Access to Guns

At trial, the state was unable to produce the murder weapon or to directly link the forensic evidence to defendant, but it did introduce extensive evidence of defendant's access to guns. The state's primary witness on that front was Santiago. Santiago was interviewed by Providence police one week after Gay was murdered and at a time when Santiago had a pending robbery charge. During that interview, Santiago gave the police information about defendant's access to firearms. At trial, Santiago testified that defendant told him and some friends that he was romantically involved with Lisa and that, while Lisa's grandfather was in Florida, the pair had used the grandfather's Johnston home for a liaison.

Santiago said that, according to defendant, while Lisa was in the bathroom, he rummaged through the grandfather's bedroom and discovered a 9 mm handgun, two shotguns, a 20-gauge and a 12-gauge, as well as a .22-caliber rifle under the bed. Santiago said defendant had brought those guns to Arciliares's garage. He described the handgun as being chrome with a black handle, and he said defendant kept it on his person at all times. He also said that defendant stashed the other weapons at Arciliares's house and that they often fired them into a punching bag in Arciliares's garage. Santiago also claimed that defendant admitted to him on several occasions that it was he who had killed Dominique Gay. The defendant, he said, claimed that he was "hiding behind the dumpster until he seen Dominique Gay come out [sic] the house, that's when he started shooting at Dominique Gay."

Lisa also testified about defendant's access to her grandfather's guns. She said that her grandfather was a retired correctional officer, that he was a hunter, and that she was aware that he kept firearms in his house. She said that her grandparents had given her a key to their house and asked her to check on it while they were in Florida. She testified that she met defendant in

October of 2008 and, for a few months, she saw him almost every day. During that time, Lisa said, she and defendant frequently drove around or hung out with his friends, during which time she recalled hearing conversations about guns, including descriptions such as a "nina" and numbers such as "38 something."

Lisa testified that she brought defendant to her grandparents' house on two occasions in November. On both of those occasions, Lisa stated that she and defendant were in the house for about an hour, that they had engaged in sexual intercourse, and that Lisa briefly went to the bathroom before they left. She said that, on a few occasions, defendant had borrowed her car for several hours and that the key to her grandparents' house was on her key ring. Yet, despite seeing defendant every day from October to January, she testified that she never saw him holding any firearm. Lisa testified that she asked defendant if he took her grandfather's gun and he responded, jokingly, saying, "Yeah, I took your grandfather's gun. Why would I take it?"

The state also offered the testimony of another witness, Louise,[6] Lisa's aunt. Louise testified that she received a call from her father, Lisa's grandfather, asking that she check on the condition of his home. She said that her father "was afraid something might have happened. There may have been a robbery or something could've been disturbed in some way." When she and her husband visited the house, she called her father to tell him they had arrived. He asked her if anything looked disturbed, and she said everything looked normal. Her father then asked them to look for a handgun that he kept in the bedroom between the mattress and the box spring. When they lifted the mattress, there was no handgun; the only thing they noticed was a darkened, soiled spot on the sheet. After that, Louise and her husband removed multiple weapons from the

---

[6] We have assigned a pseudonym to Lisa's aunt in the interest of protecting her privacy.

house. She had no idea how many guns were removed, or even whether the weapons removed were handguns, because all the weapons were in cases.

After the close of all evidence, the jury returned a verdict of guilty on the counts submitted to it.

## 2

## Issues on Appeal

Before this Court, defendant argues that his convictions should be vacated for several reasons. First, defendant argues that the trial justice erred in not instructing the jury about: (1) prejudicial opening statements that detailed the expected testimony of Dean Robinson; and (2) a specific limiting instruction on the unreliability of eyewitness testimony.

Second, defendant argues that the trial justice abused his discretion when he allowed three witnesses to testify about firearms that allegedly had been stolen by defendant from the home of his girlfriend's grandparents.

Third, defendant contends that the trial justice erred in permitting the prosecution to display an "in-life" family portrait of the victim, his daughter, and his daughter's mother because the state's sole purpose for admitting it was to invoke the jurors' sympathy for the victim.

Fourth, defendant claims that the trial justice erred when he did not grant defendant's motion for a new trial.

**3**

**Discussion**

**A**

**Jury Instructions**

**i**

**The Opening Statement**

During the state's forty-minute opening statement, the prosecutor informed the jury about the testimony that the state expected to present during the course of the trial, explaining that both Andujar, and particularly Robinson, would testify to the events of the day. The prosecutor told the jury that:

> "The case will be proved directly. It's going to be proved by two men, Wilson Andujar and Dean Robinson, who will tell you directly what they saw. They saw him. They'll both tell you that they knew him, that they recognized him * * *. And both will tell you that according to Dean Robinson, it's as soon as he saw him he knew it was him."

The state repeatedly indicated that both Andujar and Robinson would say that they were acquainted with defendant and that they knew he was the shooter, but that neither had identified defendant to the police right after the crime was committed. The prosecutor explained to the jury that Andujar immediately left the state out of fear. He then said that Robinson would testify that he did not tell the police right away who the shooter was, but that he did tell Crystal Dutra "that he had seen and knew that Miguel Davis was the shooter of Dominique Gay." Furthermore, the state claimed that Robinson would say that he did not want to tell the police whom he saw "because he wanted to take care of it himself. He wanted to do to Miguel Davis what Miguel Davis had done to Dominique Gay."

The prosecutor also said that Robinson, for his own reasons, had declined to cooperate with them, but "now finally * * * [would] tell the police and did tell the police what he had seen happen to his dearest friend, this man shooting and killing him." The state ended its lengthy soliloquy by telling the jury the following:

> "Finally, you know from what you were told before you were chosen that for lack of bail this Defendant is at the ACI. You'll hear that. So is Dean Robinson. The deal he cut about his robbery landed him two years in jail, that he's now serving. He's expected to tell you, when he comes before you, that his path in November of 2012 passed with his old friend Miguel Davis about his – who he's going to give you testimony, and Miguel Davis said to him, 'Stop talking to the police.'"[7]

However, on the very day he was expected to testify, counsel for Robinson informed the court that he had advised his client to invoke his Fifth Amendment right against self-incrimination and had further advised him not to testify at defendant's trial. The trial justice had Robinson confirm, on the record and outside the presence of the jury, that he had been advised against testifying and would invoke his privilege against self-incrimination. The defendant did not move for a mistrial.

The defendant argues that the trial justice committed reversible error when he failed to accede to his request to impart a limiting instruction to the jury to remedy the prosecutor's lengthy opening statements about expected testimony from Dean Robinson, testimony the jury never heard because the witness invoked his Fifth Amendment right against self-incrimination. The defendant concedes that the prosecutor did not act in bad faith when he described the expected testimony. However, he urges that he nonetheless was prejudiced by the detailed and lengthy nature of the prosecutor's comments, including an alleged threat made by defendant to

---

[7] Defense counsel repeatedly objected during the prosecutor's opening statements, twelve times in all, but each time he was overruled.

Robinson while both of them were incarcerated. The state responds that defendant waived any right to review of this issue because he failed to renew his objection at the conclusion of the trial justice's charge to the jury. The state further argues that the trial court was not required to give any curative instruction because the prosecutor's opening statements did not cause incurable prejudice to defendant. Indeed, the state argues that any prejudice resulting from the statement and the unfulfilled promises that it contained actually harmed the state.

**1**

**Standard of Review**

"[T]he standard of review for jury instructions is well settled. A charge 'need only adequately cover[] the law.'" State v. Long, 61 A.3d 439, 445 (R.I. 2013) (quoting State v. Cardona, 969 A.2d 667, 674 (R.I. 2009)). "This Court examines 'the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them, * * * and * * * review[s the] challenged portions * * * in the context in which they were rendered.'" Id. (quoting Cardona, 969 A.2d at 674). "A 'trial justice is bound to ensure that the jury charge sufficiently addresses the requested instructions and correctly states the applicable law.'" Id. (quoting State v. Sivo, 925 A.2d 901, 913 (R.I. 2007)). "[A]n erroneous charge warrants reversal only if it can be shown that the jury 'could have been misled' to the resultant prejudice of the complaining party." Id. (quoting Sivo, 925 A.2d at 913).

**2**

**Waiver**

As a threshold issue, this Court must consider whether defendant adequately preserved the issues on jury instructions for appeal. The state maintains that this issue was not preserved because defense counsel failed to renew his objection after the trial justice completed his instructions to the jury.

Rule 30 of the Superior Court Rules of Criminal Procedure requires as follows:

> "At the close of the evidence <u>or at such earlier time during the trial as the court reasonably directs</u>, any party <u>may</u> file written requests that the court instruct the jury on the law as set forth in the request. * * * If a defendant relies upon an affirmative defense, or justification, or matter in mitigation and wishes the court to instruct the jury with respect to such, he or she shall so advise the court in writing no later than at the close of the evidence. No party may assign as error any portion of the charge or omission therefrom unless the party objects thereto <u>before the jury retires to consider its verdict</u>, stating distinctly the matter to which the party objects and the grounds of the party's objection. Objections shall be made out of the presence of the jury." (Emphases added.)

"The purpose of the rule is to ensure that the trial justice is alerted to any deficiencies in the charge while there is still an opportunity for cure." <u>State v. Hanes</u>, 783 A.2d 920, 924 (R.I. 2001). In the numerous cases where this Court has declined to address a particular issue on appeal, the reasoning is frequently directed at trial counsel's failure to alert the trial justice to the particular objection at any point in the trial. <u>See</u> <u>State v. Lynch</u>, 854 A.2d 1022, 1034 (R.I. 2004) ("waived by [the] defendant's failure to object after the trial justice instructed the jury"); <u>State v. Catalano</u>, 750 A.2d 426, 429 (R.I. 2000) (defense counsel submitted numerous requested jury instructions; following the trial justice's charge, counsel objected to request Nos. 2, 3, 5, 7, 8, 9, and 10, but did not mention No. 6); <u>State v. Brown</u>, 744 A.2d 831, 837-38, 838 (R.I. 2000) (defense counsel renewed request for simple-assault instruction but not second-degree murder;

Court held that objection was waived because "counsel failed to elucidate the reasons for [his objection to a] second-degree murder instruction").

Objections may also be waived if they lack specificity because "[g]eneral objections to instructions, without specific grounds are not a sufficient basis for review by this Court." State v. Hallenbeck, 878 A.2d 992, 1007 (R.I. 2005) (quoting State v. Ibrahim, 862 A.2d 787, 795 (R.I. 2004)). In State v. Fetzik, 577 A.2d 990, 993 (R.I. 1990), this Court considered whether an objection was raised with sufficient specificity and held that the objection and proffered supplemental instruction concerning an affirmative defense, that was not timely filed, was nevertheless preserved. We reasoned that:

> "[a]lthough the instruction was technically late, the trial justice appears to have had an adequate opportunity to consider this instruction. The requested instruction was one that could easily have been included with those that were given. * * * The time limit was intended to promote the orderly conduct of a trial. It was never intended to be an unalterable condition in the face of an otherwise meritorious request for an instruction that was of considerable importance to a defendant." Id.

Furthermore, this Court specifically held that "[b]y failing to raise a proper objection, defendant deprived the trial justice of any opportunity to remedy possible deficiencies in the instructions before they were delivered." State v. Viveiros, 45 A.3d 1232, 1244 (R.I. 2012) (emphasis added).

Finally, this Court noted that "[w]e are aware that Rule 30 * * * does not explicitly mandate that objections to instructions be made after the instructions are given." State v. Palmer, 962 A.2d 758, 766 n.5 (R.I. 2009). Nevertheless, this Court held that the objection was waived because "the trial justice informed counsel in no uncertain terms that objections were to be made after he instructed the jury." Id.

At the close of the state's case, the trial justice addressed several matters on the record but outside the jury's presence, including jury instructions. The following discussion occurred on the record:

> "[Trial Justice]: I gave to counsel yesterday a list of the instructions I intend to give.
>
> "* * *
>
> "[Trial Justice]: I don't disagree that the presence of Dean Robinson at the scene alleges his presence at the scene. Based on evidence submitted, it's unavoidable to mention his name.
> "The issue has arisen as to whether or not you will be permitted to effectively invoke the missing chair doctrine by arguing, where is he? Why didn't the State call him? Why did he promise you that he would? That's the kind of problem that has arisen.
>
> "[Defense counsel]: And my point with regard to that, Your Honor, is that the jury has heard a long litany of testimony about what Dean Robinson would testify to and he never testified. And, [the prosecutor], as I remember, went on for at least 45 minutes, going into detail about what each witness would testify to.
> "I'd ask the Court to instruct the jury to completely disregard anything that [the prosecutor] said about Dean Robinson in his opening argument. And if the Court is not willing to do that, then I should be willing to at least reference the fact that Mr. Robinson did not testify."

The trial justice then ruled that, because Robinson was unavailable as a matter of law, defense counsel would not be allowed to specifically comment that he did not appear, nor would the trial justice give an instruction that would "specifically hone in and single out [the prosecutor]'s statements about Dean Robinson and that they should somehow be disregarded or stricken." In our opinion, defense counsel's objection met the specificity requirement of Rule 30 because it "state[d] distinctly the matter to which the party object[ed] and the grounds of the party's objection."

- 16 -

At the close of instructions, counsel for both parties were called to the bench for the purpose of expressing concerns about or objections to the charge. Although defense counsel brought some concerns to the trial justice's attention, it is significant that he made no objection about Dean Robinson or the state's opening statement. Therefore, this Court must decide whether, in the context of this case, the failure to do so was fatal.

On that point, this Court's determination in State v. Pailin, 114 R.I. 725, 339 A.2d 253 (1975), is illuminating. There, the defendant objected to statements made by the state in its closing argument and moved for a mistrial. Id. at 727, 339 A.2d at 255. This Court explained as follows:

> "We have made it perfectly clear that for a defendant to preserve a question of prejudicial error in closing argument for our review he must not only make an objection at the time, but must make a request for cautionary instructions. Except under circumstances where the trial justice could find no fault with the challenged remarks, or where they are so flagrant that no precautionary instruction could dilute their effect, this failure to request instructions is fatal. * * * The defendant asked the trial justice to declare a mistrial, but once this request was denied, he remained silent and did not request instructions either at the bench conference or at the close of the state's argument, nor did he object to any of the justice's charges to the jury in regard to this point. Having failed at trial to request curative measures of the allegedly prejudicial remarks of the prosecutor, defendant will not be heard to complain here." Id. at 728, 339 A.2d at 255 (emphases added).

After a thorough review of the record, it is our opinion that we would be elevating form over substance if we were to hold that defendant failed to adequately preserve the issue of the trial justice's denial of a request for a limiting instruction. We observe that, although defendant did not renew the objection after the trial justice instructed the jury, he did object the day before during a recorded charging conference after instructions were provided to the parties and in

- 17 -

response to the trial justice's request for specific objections. Therefore, defendant adequately preserved the issue of the trial justice's denial for a limiting jury instruction for appeal.

**3**

**Did the Opening Statement Cause Prejudice Requiring a Limiting Instruction?**

The defendant argues that the state predetermined the outcome of this case by virtue of its opening statement because it was permitted to present to the jury a lengthy and persuasive narrative of the events, introducing anticipated direct quotes from Robinson, the most important eyewitness, without giving defendant a chance to cross-examine. The defendant contends that Robinson's "phantom" corroboration of Andujar's identification, particularly when paired with the state's concluding allegation that defendant warned Robinson not to testify, doomed defendant. The state maintains that it operated on the good-faith belief that Robinson was going to testify exactly as it laid out in its opening, and that any prejudice that might have arisen as a consequence of Robinson's failure to appear before the jury inhered against the state, because it failed to deliver on its promise to present him.[8]

It is well settled that "[t]he prosecutor is entitled, during opening statements, to comment on evidence the prosecutor believed in good faith will be available and admissible." State v. Usenia, 599 A.2d 1026, 1032 (R.I. 1991). "The general rule in such situations is that there must be a good-faith and reasonable basis upon which a prosecutor may believe that such evidence will be offered and deemed admissible at trial." State v. Ware, 524 A.2d 1110, 1112 (R.I. 1987).

---

[8] As an initial matter, this Court feels obliged to note that despite defendant's not having raised a constitutional claim under the Confrontation Clause during the trial with respect to this issue, such a claim would have no traction. This is so because we have held that "[w]hen a witness refuses to testify and invokes a legitimate Fifth Amendment privilege, the Sixth Amendment Confrontation Clause no longer applies because the witness is unavailable." State v. Ramirez, 936 A.2d 1254, 1265 (R.I. 2007) (citing California v. Green, 399 U.S. 149, 167-68 (1970)).

Although this issue most often arises in the context of a motion to pass, the following rule is instructive:

> "When a defendant complains of allegedly prejudicial remarks made by a prosecutor, the trial justice must [assess] the potential prejudicial impact of the challenged comments. If the prejudice is inexpiable, the motion to pass should be granted. If the prejudice can be cured, timely and effective instructions must be given." State v. Collazo, 446 A.2d 1006, 1010 (R.I. 1982) (citing State v. Marrapese, 116 R.I. 1, 351 A.2d 95 (1976)).

Furthermore, the "[d]etermination of whether a challenged remark is harmful or prejudicial cannot be decided by any fixed rule of law." Id. (citing State v. Peters, 82 R.I. 292, 107 A.2d 428 (1954)). "Rather, the justice must evaluate its probable effect on the outcome of the case by examining the remark in its factual context." Id. (citing State v. Pugliese, 117 R.I. 21, 362 A.2d 124 (1976)). "Prejudice inheres if the comments 'are totally extraneous to the issues in the case and tend to inflame and arouse the passions of the jury' against the defendant." Ware, 524 A.2d at 1112 (quoting Collazo, 446 A.2d at 1010).

In Usenia, 599 A.2d at 1032, the defendant challenged a comment by the prosecutor that "[i]ncriminating evidence is found both inside the car and on the person of the people inside the car," because that incriminating evidence was not later admitted. We held that there was no error in overruling the defendant's objection, reasoning as follows:

> "The prosecutor was justified at that time in believing that these relevant items would be admitted into evidence. The prosecutor is entitled to tell the jury what he intends to prove. If the prosecution is unable to prove what has been promised, it will lose credibility with the jury and [the] defendant will benefit." Id.

In Collazo, 446 A.2d at 1009, the defendant challenged comments made by the prosecutor to the jury that the murder weapon had been stolen by the defendant from an off-duty policeman. This Court determined that those remarks were improper because there was no competent and

admissible evidence to support the claim that the defendant stole the murder weapon. Id. at 1010. However, because there was substantial other evidence submitted at trial from which the jury could infer premeditation—the basis for which the state claimed it made the improper comment—this Court held that "the challenged remarks did not have any effect on the determination of [the] defendant's guilt or innocence." Id. at 1011.

Here, because defendant concedes that the state acted in good faith when it offered a preview of Robinson's expected testimony, we need only address whether the comments were so prejudicial that the trial justice was required to give specific limiting instructions. The comments throughout the state's opening statement centered on testimony that it believed would be directly presented to the jury by Robinson.

We believe it to be significant that the trial justice attempted to cure whatever prejudice that might have inhered to defendant by repeatedly admonishing the jury that "the statements of lawyers are not evidence." See State v. Monteiro, 924 A.2d 784, 792 (R.I. 2007). The trial justice made this comment before the state's opening statement, at the close of evidence, and again in the course of his jury instructions. Indeed, it is readily apparent that the trial justice tailored his remarks to the jury in response to defendant's concern that he might be prejudiced, telling the panel: "As I said to you at the beginning of the trial, statements of lawyers are in no way to be considered as evidence. I renew that sentiment again, and remind you that anything a lawyer has said or is about to say in closing arguments is not evidence."

Therefore, we discern no error by the trial justice when he declined to give the specific limiting instruction requested by defendant to disregard what the state said in its opening statement about Dean Robinson.

## Eyewitness Identification Testimony

The defendant argues that the trial justice committed reversible error when he refused to grant defendant's request for instructions on certain factors for the jury to consider when assessing the reliability of eyewitness identification testimony. The defendant urges that, because Andujar's identification was so unreliable,[9] a specific instruction was necessary to ensure that the jury properly considered all the risks associated with misidentification. The defendant argues that Andujar's identification was particularly unreliable because he could not have viewed the gunman for more than a second or two, because he began to run as soon as he saw the gun and the first shot was fired, and because the gunman's features were partially covered. Also, defendant contends that, although he asserted that he knew defendant, he had not seen him for several years and had never spoken to him, and he did not identify defendant as the shooter until after watching a video of defendant being arraigned for this specific crime, more than three years after the shooting. For those reasons, defendant requested that the trial justice give the jury "some sort of <u>Neil v. Biggers</u> identification instruction." The state responds that the trial justice's decision comported completely with Rhode Island law and to hold otherwise would result in a rejection of thirty years of this Court's precedent.

## 1

### Waiver

The state concedes that defendant's objection to the trial justice's refusal to include an instruction on eyewitness identification testimony was preserved for the record. Indeed, the trial justice said that "[defendant's] objection of my not including such a charge is noted for the

---

[9] It should be noted that defendant did not press an earlier motion to suppress Andujar's identification of defendant.

record." However, before this Court, defendant advances a host of essays, studies, and scientific data that attack the reliability of eyewitness identification. Therefore, and in accordance with our uniform and well settled precedent, those theories that were not raised before the trial court cannot be considered on appeal. E.g., State v. Bido, 941 A.2d 822, 828 (R.I. 2008).

**2**

**The Need for Eyewitness Identification Instructions**

The defendant argues that Andujar's identification of defendant was particularly unreliable and that the trial justice failed to consider the unique facts of this case to determine whether limiting instructions would be appropriate. The state responds that the trial justice did precisely what this Court's precedents on the issue require.[10]

In the seminal case of State v. Andrade, 544 A.2d 1140, 1142-43 (R.I. 1988), this Court reviewed a trial justice's refusal to give specific jury instructions on identification testimony, one of which cite contained the five factors set forth by the United States Supreme Court in Neil v. Biggers, 409 U.S. 188, 199-200 (1972).[11] We affirmed the conviction and held, as the trial justice in this case remarked, that "the better practice for a trial justice is to rely on general instructions concerning identification." Andrade, 544 A.2d at 1143. In Andrade, we also

---

[10] The standard of review for jury instructions is described in State v. Long, 61 A.3d 439, 445 (R.I. 2013).

[11] "The factors to be considered when determining the independent reliability of an identification are the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." State v. Gatone, 698 A.2d 230, 236 (R.I. 1997) (citing Neil v. Biggers, 409 U.S. 188, 199-200 (1972)). Although the Neil v. Biggers test was developed to determine the admissibility of an identification, the factors have repeatedly been asserted when requesting jury instructions on the subject. See State v. Lynch, 770 A.2d 840, 845 (R.I. 2001); State v. Williams, 733 A.2d 723, 725 (R.I. 1999) (mem.); State v. Gomes, 604 A.2d 1249, 1256 (R.I. 1992); State v. Andrade, 544 A.2d 1140, 1142-43 (R.I. 1988) (requested jury instruction cited five factors from Neil v. Biggers.).

admonished that "[i]t remains a rule in this jurisdiction that judges are inhibited from commenting upon the evidence, unless they do so in a completely impartial manner." Id. We revisited and reinforced the holding in Andrade one year later, where we said that "it is established Rhode Island law that a specific jury instruction on identification is not mandatory and failure to give such an instruction is not reversible error." State v. Payette, 557 A.2d 72, 73 (R.I. 1989).

Although we have never turned away from our holdings in Andrade and Payette, we have, nevertheless, approved instructions focusing on the reliability of eyewitnesses in a number of subsequent decisions. See State v. Austin, 114 A.3d 87, 92-93, 97-98 (R.I. 2015); State v. Figuereo, 31 A.3d 1283 (R.I. 2011); State v. Werner, 851 A.2d 1093 (R.I. 2004) (Werner II); State v. Werner, 831 A.2d 183 (R.I. 2003) (Werner I); State v. Gomes, 604 A.2d 1249, 1256 (R.I. 1992).

Indeed, in Werner I, 831 A.2d at 205, this Court explicitly rejected an argument that giving an instruction on eyewitness identification "constituted an unfair comment upon the evidence," and we sought to clarify Andrade and Payette by explaining that "[i]n none of these cases did we state that giving a portion of this general instruction on a photograph array would constitute reversible error. At most, we said that this model instruction need not be given." Id. at 206. In Werner II, 851 A.2d at 1099, we were asked to determine whether the trial justice erred in denying the defendant's motion to introduce testimony of an expert witness on the subject of eyewitness testimony. In affirming the trial justice's decision to exclude the expert testimony, this Court reasoned that the trial justice "was careful to address the issue that concerned [the] defendant about eyewitness identification during his jury instructions." Id. at

1102. Notably, this Court reviewed the lengthy instruction given on eyewitness identifications and wrote the following:

> "Most importantly, the trial justice went beyond the scope of concerns brought to his attention by [the] defendant and said authoritatively that eyewitness 'identification must be viewed with great caution.' The trial justice's instructions had much of the same effect on the jury as listening to an expert. Juries give great weight to what a trial justice says, so by alerting the jury to the inherent problems with eyewitness identifications, the jury was sufficiently reminded to use common sense to determine what evidence to believe and what to question." Id. at 1102-03.

That instruction was not only affirmed as adequately covering the law, but was approved by this Court because it straddled the fine line between directing the jury's attention to the inherent problems of eyewitness testimony and improperly commenting on issues "within the framework of lay opinion." Id. at 1103 (quoting State v. Gardiner, 636 A.2d 710, 713 (R.I. 1994)).

In Figuereo, 31 A.3d at 1288, the defendant challenged the trial justice's refusal to include a specific instruction that "an eye witness's certainty is not a reliable indicator of eye witness accuracy." However, the instruction that the trial justice did provide focused great attention on the issue of witness identification; the trial justice told the jury that "you don't have to believe that the identification witness was lying or not to find the defendant not guilty. It is enough that you conclude that the witness was mistaken in her belief or impression." Id. at 1290-91. When we reviewed that instruction on appeal, we said:

> "Although the trial justice did not explicitly employ the defendant's requested language, he nonetheless did convey to the jurors the message (1) that they should scrutinize the testimony of an identification witness from several points of view and (2) that they were free to (in the words of the trial justice) 'conclude that the witness was mistaken in her belief or impression.'" Id. at 1291.

Finally, this Court recently decided, in Austin, 114 A.3d at 97-98, that instructions on eyewitness testimony that identified several factors for the jury to consider—such as "the witness's state of mind at the time of the offense, and other circumstances affecting the witness's opportunity to observe the person committing the offense"—adequately covered the law concerning eyewitness identifications. Despite the trial justice's refusal to give, at the defendant's urging, a thirteen-page instruction based on factors compiled by the Innocence Project,[12] this Court held that the instruction, which touched upon the potential unreliability of eyewitness identification testimony, was appropriate and an adequate instruction on the law. Id.

Here, the trial justice articulated the following reasoning for declining defendant's oral request to give "some sort of Neil v. Biggers identification instruction":

> "It is not my practice to give the jury that type of instruction. And the case law from our Supreme Court in a number of instances has indicated that it is not necessary to give that instruction, and that counsel should argue the issue. See State v. Andrade, 544 A.2d 1140 (1988), where the Court indicates, We believe that the better practice for a trial justice is to rely on general instructions concerning identification. Counsel should argue the case – excuse me, counsel should argue the issue. Citing Fenner 503 A.2d, at Page 525.
> "The other cases that are in accord with that type of language, see Gomes 604 A.2d 1249, 1256; State v. Payette, 557 A.2d 72 (1989): Where the Court notes that a specific instruction setting forth the factors to be considered in determining reliability of a witness's identification is not required, but the jury should be told that the State must prove beyond a reasonable doubt that the defendant was, in fact, the person who committed the offense. That language is also contained in Andrade. See also Desroisers 559 A.2d 641, 645 and 646 (1989); State v. Maxie 554 A.2d 1028 (1989)."

---

[12] State v. Austin, 114 A.3d 87, 97 n.11 (R.I. 2015) (citing the instruction given in the New Jersey Supreme Court opinion of State v. Henderson, 27 A.3d 872 (N.J. 2011)); "The Innocence Project is a national litigation and public policy organization dedicated to exonerating wrongfully convicted individuals through DNA testing and reforming the criminal justice system to prevent future injustice." The Innocence Project, http://www.innocenceproject.org/about-innocence-project (last visited Jan. 15, 2016).

Because this Court repeatedly has confirmed that an instruction on the reliability of an eyewitness identification is not mandatory, but, at the same time, has held that it is not error to decline to give such an instruction, it is certainly fair to say that we have not adopted a hard-and-fast rule and that trial justices retain significant discretion with respect to the issue of eyewitness identification. After a review of the record in this case, it is our opinion that the trial justice did not stray beyond the bounds of that considerable discretion.[13]

There can be no doubt that the circumstances of this case highlight the problematic nature of eyewitness identification and its potential for misidentification; for instance, the assailant was in disguise, held a gun, the only eyewitness testified that he ran as soon as he saw the weapon and heard it discharge, the eyewitness did not identify this defendant for more than three years, and the first identification was made just days after the only eyewitness saw a video of defendant being arraigned for this crime. However, because the witness testified that he had known defendant in the past, and because the problematic nature of reliability of eyewitness identifications was not articulated in the tribunal below, we do not believe this is an opportune

---

[13] It bears noting that this Court is cognizant of the growing concern in other jurisdictions with reliance on eyewitness identification testimony, the growing body of scientific and psychological studies regarding the questionable accuracy of the accounts of eyewitnesses, and the efforts made to prevent a miscarriage of justice. However, in this case, that issue was not raised before the trial justice and is not properly before us. See Commonwealth v. Gomes, 22 N.E.3d 897, 907-16 (Mass. 2015) (updating model instructions on eyewitness identifications to include several "generally accepted principles", holding modified by Commonwealth v. Bastaldo, 32 N.E.3d 873, 877 (Mass. 2015) (requiring that "a cross-racial instruction should always be included when giving the model eyewitness identification instruction, unless the parties agree that there was no cross-racial identification")); see also State v. Cabagbag, 277 P.3d 1027, 1038-39 (Haw. 2012) (deciding that "when eyewitness identification is central to the case, circuit courts must give a specific jury instruction upon the request of the defendant to focus the jury's attention on the trustworthiness of the identification"); Henderson, 27 A.3d at 919, 920-21 (overturning long-standing precedent on evaluating trustworthiness of identification evidence; specifying many more variables that courts must consider beyond the five Neil v. Biggers factors, and clarifying when identifications are deemed admissible).

time to reverse thirty years of precedent. We are, therefore, constrained to address only the issue contested at trial: whether the trial justice abused his discretion in denying defendant's somewhat vague request for "some sort of Neil v. Biggers identification instruction."

As a result, we cannot say that we discern any error in the trial justice's decision to rule in accordance with our prior decisions in Andrade and Payette and to refrain from commenting personally on the issue, leaving it instead to the arguments of counsel. Nevertheless, we pause to note that the better practice would be for courts to provide the jury with more comprehensive instructions when eyewitness testimony is an issue, similar, for example, to those that were imparted in Austin, 114 A.3d at 92-93; and Figuereo, 31 A.3d at 1290-91.

**B**

**Admission of Gun Evidence**

The defendant argues that the trial court abused its discretion in permitting the admission of evidence of prior bad acts; namely that defendant allegedly stole guns from the home of his ex-girlfriend's grandfather. This, he says, violated Rule 404(b) of the Rhode Island Rules of Evidence. The defendant argues that it is undisputed that the murder weapon was never found and that evidence that he allegedly stole four guns—a handgun, two shotguns, and a rifle—was irrelevant, highly prejudicial, and introduced for the sole purpose of casting his character in an unfavorable light. The state responds that defendant has waived the right to press this issue on appeal because he never articulated in the trial court that the evidence violated Rule 404(b). Instead, defendant repeatedly focused his objections on the foundation and relevance of the gun evidence. Additionally, the state argues, as it did in the trial court, that the evidence was necessary to show that defendant had access to firearms.

## Waiver

At trial, the judge, the prosecutors, and counsel for defendant discussed the admissibility of the "gun evidence" at length. At first, defendant moved, in limine, to exclude the gun evidence because the grandfather had died and, consequently, no one was able to testify as to what type of handgun the grandfather may have owned. The parties discussed at length what testimony was expected from the numerous witnesses, with the state urging that the evidence was admissible because it demonstrated that defendant had access to firearms. However, the following discussion then occurred:

> "[Trial Justice]: Now, there were other guns that were taken from the house, as I recall.
>
> "[Prosecutor]: There were.
>
> "[Trial Justice]: Do you have some design on bringing in evidence of other guns stolen? They were long arms, as I recall, not handguns.
>
> "[Prosecutor]: .22 rifle and a .20 caliber shotgun, Your Honor.
>
> "[Trial Justice]: I don't know that that has any bearing upon this case.
>
> "[Prosecutor]: I don't disagree with you, Your Honor. But Kevin Santiago would be the only one at this point, that we're aware of, that could provide that information, that those guns were taken from the grandfather's house of the girl that the defendant was dating. Additionally, Your Honor –
>
> "* * *
>
> "[Prosecutor]: Santiago would [stay] at Juan Arciliares's house on Union Avenue, in a garage, when Miguel Davis came in with these three firearms and said, I was having sex with this girl, I looked under the bed, I just got these. The same day he gets them –
>
> "[Trial Justice]: Okay.

"* * *

"[Prosecutor]: That [Lisa]'s testimony would not be that she knew where the firearms were, but she was well aware that her grandfather, who was a retired correctional officer, had – and a hunter, had rifles and she had seen the rifles for the cases and knew of them to have rifles. So providing a little bit more support that these would've been rifles that were taken from him, as Santiago will testify to.

"* * *

"[Defense counsel]: From what I gather from the discovery, Santiago said – the grandfather left for Florida November 17th, 2008. He came back January 14, 2009. Santiago said he met Miguel Davis on or about [December 10th, 2008]. And he doesn't say that when he met him that he came walking in with, you know, with any firearms, but the main point that I was trying to make is that the daughter, who received a call from the grandfather, she can't testify that it was a .9 millimeter that was taken or that the grandfather had a .9 millimeter. And there's nobody that can testify that the grandfather checked for the .9 millimeter before getting on the plane. So the .9 millimeter could have been missing six months earlier. Could've been missing two months earlier.

"[Trial Justice]: That's a matter for argument, not admissibility. That's something you would argue to a jury for its weight.

"* * *

"[Trial Justice]: I don't know that the State contends that that's the only person who went in the house. But the State's contending that it was your client who was among them and that your client was the one, according to Santiago, who stole the guns. It was your client, according to Dean Robinson, who shot Dominique Gay. And the State has designs on showing access by your client to firearms. And in State v. Rios, 996 A.2d 639 (2010), the Rhode Island Supreme Court indicated that that kind of material, particularly access to firearms, even though it may not have been the very firearm that was used in the event, is admissible evidence. You read those cases that are cited there and I think you will see that admissibility is here.

"* * *

- 29 -

> "I can only tell you that it's admissible under a case like <u>Rios</u>, and there are others like them. I distinguish this from the <u>Brash</u> case. This is not the <u>Brash</u> case. This is the testimony of your client to another person saying, 'I took these guns.'"

The trial justice later revisited the gun issue, discussing whether Lisa could testify that she had seen guns in the house or that she knew there were guns in the house. There was a brief reference to a hearsay objection regarding Lisa's testimony that she had heard defendant and his friends talk about guns, but that she was unable to identify exactly who had mentioned guns. At that time, defense counsel also advanced an objection pursuant to Rule 403 of the Rhode Island Rules of Evidence because, he argued, the discussion of guns was not probative of his having a gun on March 20, 2009, and that any probative value was outweighed by its prejudicial impact. Contemporaneously, defense counsel and the trial justice had a conversation about proposed testimony by Dutra that she saw defendant with a gun in 2007. Then a pointed discussion of the relevance of guns took place:

> "[Defense counsel]: I don't think the <u>Rios</u> case says that if you've ever had a gun. Where is the cut-off? If he had a gun when he was 14, is that admissible as well? If he had a gun and went to the Training School at 15, is that admissible? I mean, where do we have a cut-off? There has to be some nexus to the event.
>
> "[Trial Justice]: I disagree with you. That's not what the cases hold. <u>Jackson</u>, in the year 2000 doesn't hold that; neither does <u>Rios</u>. In fact, <u>Jackson</u> speaks about distinguishing the <u>Brash</u> case. The weapons in <u>Brash</u> were never linked to the crime charged. They were simply used for target practice at a location unconnected to the crime; that's <u>Brash</u>. But <u>Jackson</u> distinguishes <u>Brash</u>.
>
> "* * *
>
> "[Defense counsel]: My reading of <u>Brash</u> is that possession of a weapon * * * may be used to establish that a person had the means by which to commit a crime. If he had a weapon in 2007, how does that give him the means to commit a crime in 2009?

- 30 -

"[Trial Justice]: Are you suggesting that prior handgun ownership is not relevant?

"[Defense counsel]: I'm saying in this particular case prior handgun ownership is not relevant.

"[Trial Justice]: When is it relevant?

"[Defense counsel]: I think when there's a nexus between the gun and the death of the person.

"* * *

"[Defense counsel]: The introduction, Your Honor, of evidence from Dutra with regards to a past gun is certainly spoken to pursuant to Rule 404(b), which says it prohibits the use of evidence of past crimes – the 2007 is him possessing a firearm, which is a crime – wrongs, acts to show the defendant's propensity to commit the crime with which he is currently charged.  That's exactly what they're looking to do, and that's exactly what the rule precludes them from doing.

"Pointing to a 2007 crime, which is the possession of a gun, to now say that based upon that past crime, or that past wrong, or those past acts, that the defendant has a propensity to commit – to commit crimes regarding firearms, therefore he must have committed this shooting.

"[Trial Justice]: That's not what I think the State is offering it for.  It's offering it to show that the defendant had an interest and access to firearms; and, indeed, in the past possessed a firearm.  Unless I misread the State's intention.  [Prosecutors].

"[Prosecutor]: It is what the Court has just enunciated, and it is additionally with respect to the 404(b) analysis that I intended it.  Miss Dutra's claim of having seen a gun in 2007 is reviewed by her in her Grand Jury testimony * * *.

"* * *

"In context, the State submits, that in addition to the Rios/Jackson line of access to guns, if analyzed under 404(b), he's also suggesting not only does he have an interest in guns, he's never without one.  He wants her to be with him that night.  She says, No.  Go home.  And he takes out the gun and says, 'I'm never alone.'  In other words, 'I always carry this.'

"[Defense counsel]: * * * But I mean, equally important what Rios also said is this: It is only when evidence of prior acts is offered to prove that the accused has a criminal disposition and therefore is more – is more likely to have committed the crime for which he stands accused and Rule 404(b) requires its exclusion.

"* * *

"[Trial Justice]: Let's do this: I think, number one, I will permit the testimony that [Lisa] would offer relating to a conversation she overheard the defendant involved in with his friends talking about guns. And that from her point of view and from knowing him, as she said at Page 18 in the Grand Jury, 'Miguel had an interest in guns.' I'll let her testify to that.

"As to whether or not I'll permit the 2007 incident that Dutra would testify to, if permitted, I'm going to reserve on that. I'm not sure. I hear both your arguments. The motion in limine to exclude Dutra from testifying to that I'm going to hold off because I'm not sure yet. I have to see how the case unfolds."

No further rulings were made during that discussion on the issue of the guns defendant allegedly took from the house.

Several days later, the parties once again addressed the issue of guns. The defendant again objected to the testimony of Lisa and Louise on the grounds that there was no testimony about when the handgun was last seen under the mattress. The defendant further argued to the trial justice that the evidence was irrelevant because no one saw the make of the grandfather's handgun, and Santiago's testimony that it was a chrome gun contravened Andujar's testimony that he saw a dark gun. The trial justice decided that Louise could testify to her father's statements because, pursuant to Rule 804(c) of the Rhode Island Rules of Evidence, they were declarations of a deceased person made in good faith.

During that pretrial discussion about firearms evidence, the comments about Lisa and Dutra became confused, but the trial justice ultimately ruled as follows:

"[Trial Justice]: Pulling the gun out, making the comment to her, 'I'm never alone,' in the context of all the other evidence that's

- 32 -

coming in: The conversations about guns that he's interested in; Santiago seeing him with the gun; Santiago being told by Davis that he got these guns, that's all a whole panoply of evidence that's intertwined among and between each other. And that kind of evidence becomes very relevant and admissible and outweighs any prejudice that might [inure].

"[Defense counsel]: So the 2007 – you're saying that the 2007 statement by [Lisa] about seeing a gun is relevant.

"[Prosecutor]: Crystal [Dutra].

"[Defense counsel]: To Crystal [Dutra] seeing the gun is relevant to a killing that took place in 2009, without any evidence to show that he was in continuing possession of that firearm for two years.

"[Trial Justice]: I'm saying that given all the evidence that has been offered or proffered, plus Rios, and the Michigan case, and the cases that speak of intertwining of evidence that is relevant, it's coming in. Your request to exclude it is denied * * * You have your exception. I've made my ruling.

"[Defense counsel]: I have another motion then. Motion to exclude evidence of other crimes. That firearm coming in is evidence of another crime. It's evidence that he possessed a firearm illegally two years earlier.

"[Trial Justice]: I have told you it's coming in. I will give a cautionary instruction. On balance, on Rule 403 I have decided it's much more relevant and probative than it is prejudicial, based on the comments I made yesterday, based on the comments I've made today. Your objection is noted for the record. It's coming in."

Before Lisa testified, defense counsel requested a sidebar. During that discussion, defense counsel asserted that, because he was advised to raise again any objections that had been addressed in motions in limine, he wished to "re-rais[e] the issue with regard to [Lisa]'s testimony about the shooting on Union Street." Later in the testimony, defendant objected, without indicating a basis, to the question "Now, did you ever bring the defendant to your grandparents' house in Johnston?" The objection was overruled. The defendant similarly

- 33 -

interjected objections throughout Louise's testimony without providing a basis; however, he did not attempt to renew any arguments that he had raised in limine at the start of Louise's testimony.

The state argues that defendant waived any issue about prior bad acts on appeal because he did not adequately raise a Rule 404(b) objection to either Lisa or Louise's testimony about defendant's access to guns to the trial justice in his motions in limine. The state also asserts that, even assuming defendant properly raised the issue before trial, he did not properly preserve the issue for appeal because he failed to object to the same evidence when it was proffered at trial. The defendant responds that the trial justice repeatedly denied defendant's motions on issues of relevancy and other misconduct evidence on the grounds that State v. Rios, 996 A.2d 635 (R.I. 2010), permitted evidence of access to guns. The defendant urges that the trial justice's rulings to pretrial motions squarely addressed the issues raised on appeal and were sufficiently definitive to satisfy defendant's obligation to raise the issue again during trial.

"According to our well settled 'raise or waive rule,' a litigant must make a timely and appropriate objection during the lower court proceedings before this Court will indulge the issue on appeal." State v. Grant, 840 A.2d 541, 546 (R.I. 2004) (citing State v. Toole, 640 A.2d 965, 972-73 (R.I. 1994)). "[T]he objection must be 'sufficiently focused so as to call the trial justice's attention to [its] basis * * *.'" State v. Ciresi, 45 A.3d 1201, 1212 (R.I. 2012) (quoting State v. Brown, 9 A.3d 1240, 1245 (R.I. 2010)). Furthermore, "[t]he preliminary grant or denial of an in limine motion need not be taken as a final determination of the admissibility of the evidence referred to in the motion." State v. Gadson, 87 A.3d 1044, 1053 (R.I. 2014) (quoting State v. Torres, 787 A.2d 1214, 1220 (R.I. 2002)). "We repeatedly have expressed our view that a failure to object 'in the vital context of the trial itself (except where the in limine ruling was

unequivocally definitive) [constitutes] a waiver of the evidentiary objection and [is] therefore an issue that may not be raised on appeal.'" State v. Andujar, 899 A.2d 1209, 1222 (R.I. 2006) (quoting State v. Kaner, 876 A.2d 1133, 1134 n.4 (R.I. 2005) (mem.)).

In Andujar, this Court held that a trial justice's in limine ruling was unequivocally definitive based on the following language:

> "No one, no witness, no counsel, no pro se litigant will offer any witness, evidence, statement or argument that [the defendant] was acquitted [of those charges]. I will instruct the jury if there's any reference to that case at all that it is totally irrelevant and immaterial as to whether or not that case has even been resolved, let alone what the result was. * * * You can't mention the outcome. That's the court's order. You can appeal me." Andujar, 899 A.2d at 1222.

We decided in that case that "the phrase '[y]ou can appeal me' clearly indicates a certain finality." Id. We further reasoned that "[t]he effect of such a categorical ruling is to force a defendant to adapt his trial strategy to compensate for the loss of this valuable evidence, thereby lessening the likelihood that he will attempt to admit it at trial in contravention of the trial justice's clear order." Id.

Initially, we are not persuaded by the state's argument that defendant's objection was not "sufficiently focused," because, although he raised Rule 404(b) in addressing Dutra's expected testimony, his objection was neither focused nor articulate and conflated the testimony of Dutra and Lisa. The defendant repeatedly argued to the trial justice that the "stolen guns" evidence was highly prejudicial, that there was not a sufficient nexus between the guns that had been stolen and the murder weapon, and he specifically challenged the trial justice's reliance on our holding in Rios.

The sole issue that this Court addressed in Rios, 996 A.2d at 638, was whether the trial justice committed error because evidence that two witnesses had observed the defendant in

possession of a handgun several months prior to the murder was inadmissible under Rule 404(b). This Court determined "that the trial justice engaged in the appropriate analysis of the testimony offered by both [witnesses] by first evaluating the relevance of the proffered testimony under Rule 404(b) and then carefully weighing the probative value of the testimony against the danger of unfair prejudice under Rule 403." Rios, 966 A.2d at 640-41. The trial justice in the case at bar conducted precisely the same analysis at defense counsel's urging. Thus, it is readily apparent to this Court that, in founding his decision squarely on our ruling in Rios, the trial justice was adequately alerted to the basis of defendant's objection on Rule 404(b) grounds.

However, we are not convinced that the trial justice's several and temporized rulings on the pretrial motion were "unequivocally definitive" to relieve defendant of his obligation to raise the issue again in "the vital context of the trial itself." See Andujar, 899 A.2d at 1222 (quoting Kaner, 876 A.2d at 1134 n.4). Not only were the issues of access to or interest in guns repeatedly reargued before trial, but the issues became intertwined and conflated. On more than one occasion, the trial justice indicated that he was unsure of what his final decision would be and that he wished to reevaluate his rulings after seeing how the trial progressed.[14]

Therefore, it is our considered opinion that defendant did not properly preserve the issue for appeal and we will not address the merits of the argument.

## C

### In-Life Family Portrait Photograph

The defendant next argues that the trial justice committed reversible error when he allowed the state to introduce an "in-life" family portrait-style photograph of the victim, Dutra,

---

[14] On the occasion that the trial justice was most definitive—when he said, "Your objection is noted for the record. It's coming in."—he was specifically referring to the testimony of Dutra that she saw defendant with a gun in 2007. That evidence was not, in the end, admitted and therefore is not at issue in this appeal.

and their daughter. The defendant urges that the photograph had no probative value and was introduced by the state for the sole purpose of engendering the jury's sympathy, thereby prejudicing defendant. The state responds that (1) this issue was not preserved for appeal and (2) that it needed the photograph to meet its burden of proving all the elements of the case, including the identity of the victim, and to show that defendant knew the victim.

**i**

**Waiver**

The defendant included an objection to the photograph among his motions in limine. The trial justice made the following ruling on the record:

> "I'm satisfied that there's nothing prejudicial about this photograph, to the extent that you are concerned about sympathy being generated. [Defense counsel], both you and [the prosecution] may have already told the jury that they must not be swayed by sympathy. Of course, I will be telling them the same thing. This was a rather tame photograph. There's nothing prejudicial about it, in any event. That will be admitted if proper foundation is laid."

During the trial, Dutra was asked if she recognized the photo, to which she responded affirmatively. The state then moved to have the photo marked as a full exhibit and there was no objection. When the state asked Dutra if the photo was something that was displayed in her home, defendant objected without providing any basis; the objection was overruled. No objection was made when the state asked the witness if defendant had claimed that he did not know Gay.

It is clear to us that the trial justice's in limine ruling on the admission of the photograph was not "unequivocally definitive," and, therefore, defendant's failure to object when the photograph was introduced is fatal to his arguing the issue on appeal.[15]

**D**

**Motion for New Trial**

The defendant's final argument on appeal challenges the trial justice's denial of his motion for a new trial, pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. The defendant submits that the trial justice was clearly wrong in affirming the jury's verdict because the state's two key witnesses, Andujar and Santiago, were either unreliable or otherwise unworthy of belief.

**i**

**Standard of Review**

"When ruling on a motion for a new trial, the trial justice acts as a thirteenth juror, exercising 'independent judgment on the credibility of witnesses and on the weight of the evidence.'" State v. Heredia, 10 A.3d 443, 446 (R.I. 2010) (quoting State v. Imbruglia, 913 A.2d 1022, 1028 (R.I. 2007)). "Specifically, 'the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the

---

[15] We pause to note that, had defendant properly preserved his objection, we would not have identified an abuse of discretion in admitting the photograph. "Decisions about the admissibility of evidence on relevancy grounds are left to the sound discretion of the trial justice * * *. Furthermore, when reviewing such decisions, we will not conclude that a trial justice abused his or her discretion as long as some grounds to support the decision appear in the record." State v. Pena-Rojas, 822 A.2d 921, 924 (R.I. 2003). Here, the trial justice considered defendant's argument and the proffered relevance of the photo by the state, finding that it was relevant and not prejudicial. The trial justice further offered to protect defendant from any prejudice by instructing the jury "that they must not be swayed by sympathy." See also State v. Spratt, 742 A.2d 1194, 1198 (R.I. 1999) (finding in-life photograph of victim relevant to the victim's identity, which the state "is burdened with proving to support the charge of murder"); State v. Bertram, 591 A.2d 14, 23 (R.I. 1991) (same).

evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury.'" Id. (quoting State v. Texieira, 944 A.2d 132, 140 (R.I. 2008)). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." State v. Otero, 788 A.2d 469, 472 (R.I. 2002) (citing State v. Marini, 638 A.2d 507, 515-16 (R.I. 1994) and State v. Clark, 603 A.2d 1094, 1096 (R.I. 1992)). "If, however, 'the trial justice finds that the state has failed to sustain its burden of proof, a new trial must be ordered.'" Id. (quoting Clark, 603 A.2d at 1096).

**ii**

**Analysis**

The trial justice began his consideration of the motion for a new trial with this astute observation: "If Kevin Santiago's testimony was credible, there was no way Miguel Davis was going to avoid conviction in this case." Santiago testified that defendant admitted to him that he shot the decedent, and it was clear from the verdict that the jury accepted that testimony, an acceptance that the trial justice said he could not fault. The trial justice noted that Santiago was "vigorously" cross-examined and related details on some important factual items that showed he was not simply making up facts to impress the jury. Many of those details—"[f]or example, he recounted how the defendant had told him he had had sex with [Lisa] at her grandparents' house, that he knew where the house was, and he knew the guns were under the bed, and that the grandfather may have been some kind of a law enforcement officer"—corroborated his testimony about defendant. Moreover, Santiago's testimony that defendant showed him a 9 mm handgun was corroborated by the forensic evidence revealing that a 9 mm handgun was used to murder Dominique Gay.

The trial justice explained that he too found Santiago's testimony to be credible and that it was supported by Dutra, who provided a motive for defendant to bring harm to Gay. He further found that with the testimony of Andujar, "the evidence of guilt becomes overwhelming." The trial justice described that Andujar was not a stranger to defendant and, despite the shooter's attempt to hide his identity, Andujar testified that he had known that the assailant was defendant since the day of the shooting. Additionally, the trial justice found that Andujar's explanations for not telling the police what he knew were believable—particularly that he was in fear for his life because he had just seen his friend murdered while he was walking with him on a public street. Finally, the trial justice said he was not at all critical of the jury's apparent acceptance of Andujar's testimony.

The trial justice also addressed several of the arguments defendant has raised on appeal, explaining that each of the issues was addressed before and during trial and that he stood by his rulings. Finally, the trial justice concluded that he was "convinced beyond peradventure that the jury's verdict was absolutely the correct one, that it was beyond a reasonable doubt, that the defendant's guilt was established."

Our review of the record convinces us that the trial justice more than met his obligations to consider the evidence in light of the jury charge, independently assess the credibility of the two most important witnesses, Andujar and Santiago, and determine whether he agreed with the jury's ultimate verdict. With that, our review of the trial justice's decision to deny the defendant's motion for a new trial comes to an end. We see no error in the trial justice's considered determinations.

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record is remanded to that tribunal.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**  State v. Miguel Davis.

**CASE NO:**  No. 2013-312-C.A.
(P1/12-2479AG)

**COURT:**  Supreme Court

**DATE OPINION FILED:**  February 5, 2016

**JUSTICES:**  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**  Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**  Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

For State:  Lauren S. Zurier
Department of Attorney General

For Defendant:  Catherine Gibran
Office of the Public Defender