Justice GOLDBERG,
with whom THE CHIEF JUSTICE joins, concurring in part and dissenting in part. '
I join the majority’s well-written opinion clarifying this Court’s standard of review of a hearing justice’s summary dismissal of an applicant’s postconviction-relief (PCR) application and its affirmance of the hearing justice’s summary dismissal of Reyes’s claim that his 1994 nolo contendere plea violated Rule 11 of the Superior Court Rules of Criminal Procedure and was not knowing, intelligent, and voluntary.[1] I *662 also unhesitatingly join the majority’s insightful decision to abrogate the farce-and-mockery language of State v. Dunn, 726 A.2d 1142, 1146 n. 4 (R.I.1999), and its progeny and to reiterate that Rhode Island is, henceforth, a strictly Strickland[2] jurisdiction with respect to claims of ineffective assistance of counsel.
I part company with my colleagues, however, on the issue of whether the hearing justice’s summary dismissal of Reyes’s claims of ineffective assistance of counsel was proper. These claims alleged violations of a fundamental constitutional right. This first PCR application was Reyes’s one and only chance to assert these claims. The attorney who was appointed to represent Reyes concluded — without conferring with Reyes’s trial counsel — that these claims lacked merit. This determination was premature. Reyes was then forced to represent himself and was instructed by the hearing justice to come forward with “something of great significance.” He did so. Reyes presented the hearing justice with the Cepeda statement before the state filed its motion for summary dismissal under G.L.1956 § 10-9.1-6(c). Although the majority claims that the Cepe-da statement is “riddled with maladies,” all of the supposed “maladies” stem from one aspect of the statement: The registered notary public took the statement over the telephone and notarized it, rather than having Ismael Cepeda (Cepeda) swear to its contents in his presence.[3] The hearing justice considered the Cepeda statement and nonetheless summarily dismissed Reyes’s ineffectiveness claims.
In concluding that the hearing justice was “barred” from considering the Cepeda statement, the majority overlooks four critical facts. First, Reyes was forced to proceed pro se after postconviction counsel, who was statutorily required to represent him zealously, jumped ship long before Rule 11 of the Superior Court Rules of Civil Procedure required such a drastic course of action. Second, the Cepeda statement — which the majority analyzes as if it were a document submitted in opposition to a summary-judgment motion — was submitted before the state moved for summary dismissal under § 10-9.1-6(c). Third, the state did not coherently raise any argument that the hearing justice was barred from considering this document at the summary-dismissal stage, nor did the hearing justice hold that she was so constrained. Fourth, the “maladies” of which the majority complains were caused by the actions of the notary and not by Reyes, who remained in prison, stripped of counsel and forced to proceed pro se. In my opinion, summary dismissal of these claims was improper; an evidentiary hearing, at which Reyes would have been accorded his right to counsel, was required. Therefore, I respectfully dissent and express my concern about the posture the majority has taken in this appeal.
Timing and Nature of Claims of Ineffective Assistance of Counsel
In this jurisdiction, a claim of ineffective assistance of counsel ordinarily cannot be addressed by this Court on direct appeal; instead, such claims must be asserted in a PCR application.[4] See State v. Brouillard, *663 745 A.2d 759, 768 (R.I.2000). At the same time, the statutory framework governing the PCR context mandates that, in most cases, an applicant will have but ope opportunity to press a claim for postconviction relief. Section 10-9.1-8 provides that:
“All grounds for relief available to an applicant at the time he or she commences a proceeding under this chapter must be raised in his or her original, or a supplemental or amended, application. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief, may not be the basis for a subsequent application, unless the court finds that in the interest of justice the applicant should be permitted to assert such a ground for relief.”
The upshot is that, in this jurisdiction, a criminal defendant has one and only one opportunity to assert a claim for ineffective assistance of counsel, and that opportunity almost always must occur in the PCR context. See Martinez v. Ryan, — U.S. -, 132 S.Ct. 1309, 1315, 182 L.Ed.2d 272 (2012) (explaining that, when claims of ineffective assistance of counsel can be raised only in a collateral proceeding, such as the PCR context in this state, “the initial-review collateral proceeding [is] a prisoner’s ‘one and only appeal’ as to an ineffective-assistance claim”).
Compounding matters, a claim alleging ineffective assistance of counsel is of paramount importance. As the United States Supreme Court has explained, “[t]he right to the effective assistance of counsel at trial is a bedrock principle in our justice system” and “the foundation for our adversary system.” Martinez, 132 S.Ct. at 1317. For this reason, it is critical that a PCR applicant be afforded a meaningful opportunity to vindicate such a claim. As the Supreme Court has suggested, such an opportunity may require effective assistance of counsel in the PCR context:
“Without the help of an adequate attorney, a prisoner will have * * * difficulties vindicating a substantial ineffective-assistance-of-trial-counsel claim. Claims of ineffective assistance at trial often require investigative work and an understanding of trial strategy. When the issue cannot be raised on direct review, moreover, a prisoner asserting an ineffective-assistance-of-trial-counsel claim in an initial-review collateral proceeding cannot rely on a court opinion or the prior work of an attorney addressing that claim. * * * To present a claim of ineffective assistance at trial in accordance with the [s]tate’s procedures, then, a prisoner likely needs an effective attorney.” Id.
The majority concludes — correctly, in my opinion — that this ease does not present the question of whether the United States Constitution requires that a PCR applicant asserting a claim of ineffective assistance of counsel be afforded effective assistance of counsel in the PCR context. See id. at 1315 (noting this open question). However, Martinez instructs that a claim of ineffective assistance of counsel cannot be given short shrift merely because it is asserted for the first time in the PCR context and not on direct appeal. To the contrary, the claim must receive serious consideration.[5]
*664 Postconviction Counsel’s Compliance with § 10-9.1-5
The General Assembly has mandated that:
“An applicant who is indigent shall be entitled to be represented by the public defender. If the public defender is excused from representing the applicant because of a conflict of interest or is otherwise unable to provide representation, the court shall assign counsel to represent the applicant.”. Section 10-9.1-5.
This unambiguous statutory text contains no exception: A PCR applicant has the unqualified statutory right to . appointed counsel who “represent^] the applicant.” Id.
This Court, however, has qualified and cabined a PCR applicant’s right to counsel. In Shatney v. State, 755 A.2d 130, 135 (R.I.2000), this Court “established a procedure by which an attorney * * * who has been appointed to represent an applicant for postconviction relief may later seek to withdraw from that representation under specific and limited circumstances.” Campbell v. State, 56 A.3d 448, 455 (R.I.2012). In broad strokes, Shatney allows an applicant’s appointed counsel to withdraw after filing a so-called' “no-merit” memorandum containing a description of the extent of counsel’s review of the case and an explanation of why the issues raised in the application lack merit. Shatney, 755 A.2d at 135. At that point, the hearing justice is obligated to conduct a hearing in the applicant’s presence. Id. If the hearing justice agrees that the claims “lack any arguable merit,” the motion to withdraw may be granted, and the applicant is advised of the right to proceed pro se. Id. (emphasis added). '
As aptly set forth by the majority, the Shatney procedure represents nothing more than “a judicially created escape hatch” available only when continued litigation of the PCR application would violate Rule 11 of the Superior Court Rules of Civil Procedure. See Campbell, 56 A.3d at 455-56 (“The procedure set forth in Shat-ney simply applies Rule ll’s proviso to the context of the postconviction remedy, such that an attorney * * * appointed to represent an indigent applicant may withdraw from that representation when it becomes clear, after a reasonable investigation, that some or' all of the applicant’s claims lack merit.”). In other words, Shatney was not meant to water down the quality or extent of the legal representation that § 10-9.1-5 clearly grants to an indigent PCR applicant.' ‘
In the sixteen years since Shatney was decided, the procedures that have arisen scarcely resemble what was envisioned by the Shatney Court. A veritable cottage industry has arisen whereby court-appointed lawyers are proceeding as if charged with screening out meritless applications for the ax of summary dismissal. Along the way, Shatney has been transmuted from an interpretive effort to achieve coexistence between § 10-9.1-5 and Rule 11 into a high hurdle that PCR applicants must surmount’ in order to receive serious con *665 sideration of their claims on the merits. Our decision in Campbell, which the majority characterizes as the most egregious example of how Shatney has evolved, is by no means an outlier. See, e.g., Garcia v. State, 91 A.3d 359, 359-60 (R.I.2014) (mem.); Motyka v. State, 91 A.3d 351, 351-52 (R.I.2014) (mem.); Ramirez v. State, 89 A.3d 836, 838-40 (R.I.2014); Rodriguez v. State, 86 A.3d 393, 393 (R.I.2014) (mem.); Fortes v. State, 65 A.3d 478, 478 (R.I.2013) (mem.). This Court’s concerns about the denial of the right to counsel and an evidentiary hearing have caused us to modify Shatney ’s application to cases involving life without parole. See Tassone v. State, 42 A.3d 1277, 1287 (R.I.2012). I am compelled to express my belief that the time has come to abrogate Shatney, at least as it relates to first-time applicants.[6] See Campbell, 56 A.3d at 458-59 (explaining important distinction between first application and subsequent applications with respect to right to appointed-counsel under § 10-9.1-5).
I am mindful, however, that Shatney ⅛ life expectancy was not addressed by the parties in this case. I therefore proceed to analyze postconviction counsel’s efforts under the existing regime, such as it is. In my opinion, the hearing justice erred in permitting postconviction counsel to withdraw pursuant to Shatney and in failing to reappoint counsel after the Cepeda statement was produced.[7] In order to conclude that Rule 11 required him to withdraw under the Shatney procedure, postconviction counsel must have reached the point that, in his opinion, Reyes’s claims were not “well grounded in fact and * * * warranted by existing law or a good[~]faith argument for the extension, modification, or reversal of existing law.” Rule 11 of the Superior Court Rules of Civil Procedure. In his no-merit memorandum, post-conviction counsel concluded that Reyes’s claims of ineffective assistance of counsel were meritless because Reyes could not satisfy either the performance or prejudice prong of Strickland. In my opinion, post-conviction counsel’s efforts on Reyes’s behalf were insufficient to justify this conclusion. Indeed,' postcoriviction counsel did not even speak with trial counsel.
Assessment of whether an alleged ground of ineffective assistance of counsel meets the performance and prejudice prongs is a case-specific inquiry. In the past, this Court has.not hesitated to vacate the summary dismissal of an applicant’s claims of ineffectiveness where fye record did not clearly support the conclusion that one.of the prongs had not been met. See, e.g., Tassone, 42 A.3d at 1286 (“[T]he absence of a transcript, coupled with the lack of an evidentiary .hearing, precluded the court from conducting, an adequate, independent review of trial counsel’s actions and from ‘looking], at the entire performance of counsel.’, * * * No evidentiary hearing was .conducted to explore the validity of [the] applicant’s arguments, thus leaving- unexamined the foundation for a ‘reasonable probability5 that[,] but for trial counsel’s errors, the result of the proceeding would have been different.” (quoting Brown v. State, 964 A.2d 516, 528 (R.I.2009))); Hughes v. State, 609 A.2d 943, 944 (R.I.1992) (“No evidentiary hearing was *666 conducted to explore the validity of [the applicant’s ineffective-assistance-of-counsel] claims, thus leaving unexamined the foundation for a ‘reasonable probability! ]’ [under the prejudice prong of Strickland ]. The trial justice’s ruling at the [PCR] hearing that he was satisfied that [the applicant] had failed to meet the necessary standards for relief under Strickland * * * was unfounded without an evidentia-ry hearing to buttress his conclusion.”); see also Randall v. State, 609 A.2d 949, 950 (R.I.1992) (“Since a claim of ineffective assistance of counsel raises questions of fact, disposition of such a case by way of summary judgment is not possible.”).
In my view, postconviction counsel was overeager in labeling Reyes’s claims as meritless. Critically, Reyes’s 1994 conviction resulted from a plea of nolo contende-re in the Superior Court to an amended charge of maintaining a narcotics nuisance. Because there was no trial, a trial transcript from which an assessment of trial counsel’s efforts can be'made is not available. Cf. State v. D’Alo, 477 A.2d 89, 91 (R.I.1984) (“In determining whether a trial counsel’s performance was effective, no evidence is more probative than the trial transcript, for through the transcript a trial justice hearing a petition for post-conviction relief can observe, albeit second-hand, what actually happened as far as the trial counsel’s actions are concerned. Accordingly, the trial justice hearing the petition in the present case had sufficient evidence before him to assess the performance of [the] defendant’s trial counsel.”). Although the four-page transcript of the change-of-plea colloquy was attached to Reyes’s PCR application, the vast majority of Reyes’s claims of ineffective assistance of counsel had nothing to do with trial counsel’s actions or inac-tions at the plea hearing. The transcript sheds no light on the reasonableness of trial counsel’s performance with respect to these allegations of ineffectiveness. Notwithstanding this deficiency, postconviction counsel elected not to confer, in any way, with trial counsel. Even more remarkably, he concluded that Reyes failed to satisfy the performance and prejudice prongs. In doing so, postconviction counsel failed to function as Reyes’s attorney.
For starters, he made unfounded assumptions regarding trial counsel’s performance and overlooked the fact that it was his job — in the course of fulfilling his duty to represent Reyes zealously — to determine if a nonfrivolous argument could be asserted that trial counsel’s performance was unreasonable. “[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct and to evaluate the conduct from counsel’s perspective at the time.” Lynch v. State, 13 A.3d 603, 606 (R.I.2011) (quoting Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)) (emphasis added). By failing to even speak with trial counsel, postconviction counsel wholly failed to perform this fair assessment. Instead, he simply assumed that trial counsel rendered effective assistance. For example, he speculated that trial counsel “had a good understanding as to the state of the evidence against his client.” How do we know that from this record? Likewise, he stated that trial counsel “was not provided concrete information that there was additional exculpatory evidence other than what already existed.” I see no evidentia-ry support for this statement in the record. The undeniable fact that postconvietion counsel simply was assuming away the critical issue of whether trial counsel’s performance violated the Strickland standard is evident from the following passage of his no-merit memorandum:
*667 “In the absence of any evidence to the contrary, it is fair to assume that Reyes’[s] counsel complied with his responsibilities as an attorney concerning open and honest communications with his client, and that he communicated with his client in a means efficient enough so that they had meaningful discussions regarding the case.” (Emphasis added.)
Fair to whom? Certainly not to Reyes, his client, who was owed a duty of zealous advocacy. In the absence of at least a conversation with trial counsel, postconviction counsel’s conclusion that Reyes’s claims were meritless must be recognized for what it is: a premature effort to withdraw from the case.[8] Cf. Tassone, 42 A.3d at 1286 (“[T]he absence of a transcript, coupled with the lack of an evidentiary hearing, precluded the court from conducting an adequate, independent review of trial counsel’s actions and from ‘look[ing] at the entire performance of counsel.’” (quoting Brown, 964 A.2d at 528)).
At the hearing on the motion to withdraw, postconviction counsel explained that he “did not feel it was necessary to speak to [trial counsel]” because he concluded that Reyes entered into a knowing and voluntary plea. However, the fact that the 1994 plea may have been voluntary, knowing, and intelligent does not bar claims of ineffective assistance of counsel relating to trial counsel’s advice leading to the decision to enter the plea. See State v. Dufresne, 436 A.2d 720, 722, 723 (R.I.1981) (“The focus of a postconviction inquiry when there has been a guilty plea is the nature of counsel’s advice concerning the plea and the voluntariness of the plea. * * * A defendant who pleads guilty on the advice of counsel must demonstrate at his postconviction hearing that that advice was not within the range of competence demanded of attorneys in criminal cases.”). Reyes’s claims attack the effectiveness of trial counsel in advising him to enter a plea of nolo contendere. Therefore, the fact that Reyes’s plea was otherwise voluntary, knowing, and intelligent was no excuse for postconviction counsel’s failure to speak with trial counsel.
Postconviction counsel alluded to a second reason for not interviewing trial counsel: that, irrespective of whether Reyes could satisfy the performance prong, he was unable to satisfy the prejudice prong because of the highly favorable disposition of the charges. To be sure, this Court *668 previously has explained that, “when counsel has secured a shorter sentence than what the defendant could' have received had he gone-to trial, the defendant has an almost insurmountable burden to establish prejudice.” Neufville v. State, 13 A.3d 607, 614 (R.I.2011). The assessment of the strength of a-negotiated agreement, however, cannot occur in a vacuum. The need for a conversation with trial counsel flows in no small part from the unique relationship between the facts of this case and the amended charge to which Reyes pled. Anyone familiar with the disposition of criminal cases in this state would recognize that the plea agreement in this case — -in which, based on a single delivery of heroin, a two-count criminal information charging distribution of heroin within three hundred yards of a school and conspiracy to commit that offense was amended to a single count of maintaining a narcotics nuisance — was not a typical disposition. A conviction for maintaining a narcotics nuisance under G.L.1956 § 21-28-4,06(b)(1)(a) requires proof of “acts [that] are recurrent or of [a] habitual nature”; a single drug transaction is an insufficient basis upon which to convict for this offense. State v. Reis, 430 A.2d 749, 753 (R.I.1981); see id. at 754 (“[Section] 21-28-4.06 requires a showing of more than an isolated instance of the prohibited, activity.”); see also id. at 753, 754 (reversing the defendant’s convictions for maintaining a narcotics nuisance where “[t]here was absolutely no evidence, apart from this single incident that [the] defendant used his apartment or his car for the unlawful keeping or sale of a controlled substance.” (emphasis added)). Accordingly, the single drug buy set forth in the criminal information was insufficient as a matter of law to constitute the offense of maintaining a narcotics nuisance. This fact should have alerted postconviction counsel of the need to consult trial counsel.
The disposition in this case might have been highly favorable if the state’s evidence was strong and Reyes had little in the way of a defense. On the other hand, the negotiated plea agreement appears less favorable if the state’s evidence was weak, Cepeda is deemed a credible witness, and exculpatory evidence exists and is sufficiently persuasive to create a reasonable probability that the outcome of the trial would have been an acquittal. When compared to an acquittal, the disposition in this case — even without jail time — loses much of its luster; it operated as a felony conviction, it carried a term of probation (the violation of the terms and conditions of which landed Reyes in prison), and it served as one of the predicate offenses that qualified Reyes as a habitual offender. It is therefore .unsurprising that the assessment of the strength of the disposition in relation to the prejudice prong of Strickland is not often made at the summary-dismissal stage. . See Neufville, 13 A.3d at 611, 614 (commenting on the effect of a shorter sentence on the prejudice prong in a ease where an evidentiary hearing was held and findings of fact were made); Rodrigues v. State, 985 A.2d 311, 316, 317 (R.I.2009) (similar); Hassett v. State, 899 A.2d 430, 436-37 (R.I.2006) (similar); cf. Tassone, 42 A.3d at 1286 (“No evidentiary hearing was conducted to explore the validity of [the] applicant’s arguments, thus leaving unexamined the foundation for a ‘reasonable probability’ that[,] but for trial counsel’s errors, the result of the proceeding would have been different.”). Consequently, postconviction counsel’s premature assessment of the strength of the disposition did not justify his failure to interview trial counsel.
In granting postconviction counsel’s motion to withdraw, the hearing justice failed to set' forth her reasons for accepting his assessment of Reyes’s claims as meritless. Indeed, the hearing justice notified Reyes *669 that she was “not determining whether or not there’s merit to your case.” (Emphasis added.) This is error*- There is no showing on this- record that the hearing justice conducted-the independent review that Shatney requires as a prerequisite to permitting counsel to withdraw; - in fact, she declared just the opposite. See Shatney, 755 A.2d at 135 (“If, based upon its review of counsel’s assessment of the potential grounds for seeking post[ jconviction relief and of any other issues that the applicant wishes to raise, the court agrees that those grounds appear to lack any arguable merit, then it shall permit counsel to withdraw * * (emphases added)). Without a finding that the grounds set forth in the application lack any arguable merit — which, in my opinion, could not be made when no effort was made to contact trial counsel — the hearing justice should not have permitted postconviction counsel to withdraw.-
■In sum, postconviction counsel failed to appreciate his role as Reyes’s attorney, and the hearing justice erroneously granted him a free pass in permitting him to withdraw from the representation. This case is yet another example of the injustice that can accompany the Shatney procedure, which operates simultaneously as an additional court-made hurdle for PCR applicants to overcome and a mechanism for less-than-full-fledged representation of indigent applicants. Indeed, had Reyes received the counsel envisioned by § 10-9.1-5 — to which he was undeniably entitled— his counsel likely would have recognized the “maladies” of the Cepeda statement and rectified them to ensure that Reyes received full and fair consideration of his constitutional claims.
Consideration of the Cepeda Statement
The hearing justice’s error in granting postconviction counsel’s motion to withdraw, standing alone, supplies adequate and persuasive grounds to vacate the summary -dismissal of Reyes’s claims of ineffective assistance , of counsel. Nonetheless, I proceed .to note my disagreement with the majority’s incongruous decision to affirm the hearing justice’s summary dismissal of the' application on the ground that she erred in considering the Cepeda statement.
Immediately after the hearing justice granted postconviction counsel’s motion to withdraw, Reyes moved for funds to hire a private ' investigator... Reyes explained that, because “the records [of the -alleged exculpatory testimony of one of his accomplices] are. nowhere to be found,” “the investigator would only need to get the testimony from the witness.” The hearing justice denied , the motion. She then warned Reyes that, “unless there is something of great significance in your memorandum that persuades the [c]ourt that you would have gone to trial and the result would have been different, then the [c]ourt may very well be dismissing your.case.”
- Against all odds, Reyes — who remained incarcerated, indigent, and uneounseled— persuaded Nicholas Cardarelli (Cardarel-li), a private investigator and notary public in this state, to work on his behalf in an effort to come forward with “something of great significance.” He did so. Cardarelli tracked down Cepeda and took a statement from him that directly bears on the question of Reyes’s innocence. Reyes produced the Cepeda statement at' the next hearing, before the state filed — at the hearing justice’s suggestion — its motion for summary dismissal under '§ 10-9.1-6(c). Although noting certain “infirmities” of the Cepeda statement, the hearing justice explicitly, considered it: “On the basis then of the application, all of the materials that have been submitted, including, for what, it’s worth, the statement .by Mr, Cepeda, that is not a sworn statement or *670 an affidavit by Mr. Cepeda, the [c]ourt finds that there is no need to proceed further.” (Emphasis added.) The majority declares that the hearing justice erred in considering the statement because it concludes that the Cepeda statement “is riddled with maladies that barred it from the hearing justice’s consideration on summary dismissal.” In my opinion, this conclusion is erroneous on at least three independent grounds.
First, the majority treats the Cepeda statement as if it were submitted in opposition to the state’s summary-dismissal motion. It was not. The Cepeda statement was submitted in response to the hearing justice’s notice, required by statute, of her intention to dismiss Reyes’s application and her corresponding warning that she would dismiss the application unless Reyes came forward with “something of great significance.” See § 10 — 9.1—6(b) (“When a court is satisfied, on the basis of the application, the answer or motion, and the record, that the applicant is not entitled to post[ jconviction relief and no purpose would be served by any further proceedings, it may indicate to the parties its intention to dismiss the application and its reasons for so doing.”). At the time that Reyes produced the Cepeda statement, the state’s motion for summary dismissal under § 10-9.1-6(c) had not yet been filed. Therefore, the majority’s conclusion that the Cepeda statement could not be considered by the hearing justice because it is not the type of admissible evidence that can competently defeat a summary-dismissal motion flows from an erroneous starting premise.
Because the Cepeda statement was submitted in response to the hearing justice’s notice of proposed dismissal under § 10-9.1 — 6(b), that statutory section — and not the requirements of Rule 56(e) of the Superior Court Rules of Civil Procedure and this Court’s summary-judgment case law— governs its consideration. In my opinion, the hearing justice, after reviewing the Cepeda statement (which exculpates Reyes), should have realized her mistake in allowing postconviction counsel to withdraw and directed that further proceedings occur at which — at a minimum— Reyes would be provided with an attorney willing to confer with trial counsel or with a view toward securing his testimony at an evidentiary hearing. See § 10 — 9.1—6(b) (“The applicant shall be given an opportunity to reply to the proposed dismissal. In light of the reply, or on default thereof, the court may order the application dismissed or grant leave to file an amended application or direct that the proceedings otherwise continue.” (emphases added)). Instead, the hearing justice invited the state to file a motion for summary judgment, considered the Cepeda statement, and concluded — erroneously, in my view, see infra — that it was irrelevant. The hearing justice’s authority to consider the Cepeda statement was not restricted by this Court’s summary-judgment jurisprudence because the state had not yet proceeded down that path.
Second, neither the state nor the hearing justice warned Reyes that the Cepeda statement could be rejected on the basis of the so-called maladies until, if at all, the very hearing at which his PCR application was summarily dismissed. The majority overlooks this aspect of the proceeding. When Reyes first produced the Cepeda statement, the hearing justice did not, in any way, suggest that it could be rejected on the basis of any defects; instead, she indicated that it might not be relevant. Nor did the state advocate rejection of the statement based on its defects. Instead, the state devoted a single paragraph to the Cepeda statement and proffered a merits argument:
*671 “As to the second document, the purportedly] notarized (document does not contain a notary’s seal or Mr. Cepeda’s signature) statement of Ismael Cepeda, the [s]tate cannot speculate as to the purpose of this document. Mr. Cepeda testified at [ReyesJ’s bail hearing, well prior to the resolution of the instant case (and, in fact, before [Reyes]’s charges were amended pursuant to his attorney’s negotiations). Mr. Cepeda is not a ‘previously unknown’ witness, nor, by his own account, is Mr. Cepeda’s statement different from that which he testified to at the bail hearing. * * * Therefore, without further clarification, the [s]tate cannot adequately respond.”
Nothing in the above-quoted passage puts Reyes on notice that the state was advocating outright rejection of the Cepeda statement.[9] A hearing was required at this point.
In my opinion, the lack of any notice to Reyes is important in this case because he had no counsel and was expected to develop and litigate a fact-intensive claim concerning the deprivation of a fundamental constitutional right on his own, while incarcerated. Once forced to proceed pro se, Reyes ably attempted to address the concerns raised by the hearing justice and the state. When the hearing justice told him that he had better show her “something of great significance” or else face dismissal of his PCR application, Reyes produced the Cepeda statement. When the state argued that the Cepeda statement “does not contain a notary’s seal or Mr. Cepeda’s signature,” Reyes attempted to address that concern too, correctly pointing out in a supplemental memorandum that the document does, in fact, contain Cardarelli’s notary seal. Had Reyes been warned about the issues with the Cepeda statement before his application was summarily dismissed, he at least would have had an opportunity to remedy them. The hearing justice did not afford Reyes such an opportunity because she did not reject the document. Both Reyes and his appellate counsel have been blindsided in this Court— after oral argument — by the holding of the majority: that, contrary to the understanding of all involved, the hearing justice was “barred” from considering the Cepeda statement.
Finally, the majority improperly attributes to Reyes — an indigent prisoner forced to proceed pro se — the error of a registered notary public of this state that is squarely within the notary’s expertise.[10] Under these circumstances, Reyes cannot be expected to recognize that the Cepeda statement was improperly notarized. This is a fiction that I refuse to embrace. The majority relies upon the notary’s mistake and, on that basis alone, has foreclosed consideration of the merits of Reyes’s claims that his fundamental constitutional right to effective assistance of. counsel has been violated. This is not a just result.
*672 For all of these reasons, I am of the opinion-that the conclusion of the majority that the hearing justice was barred from considering the Cepeda statement was erroneous.[11]
Relevancy of the Cepeda Statement
Finally, I note my disagreement with the hearing justice’s conclusion that the Cepeda statement was not relevant to the charge to which Reyes pled and her decision- that summary dismissal of 'Reyes’s claims of ineffective assistance of counsel was proper because Reyes was unable to satisfy the prejudice prong of Strickland. Contrary to1 the hearing justice’s- assessment, the Cepeda statement is relevant to the prejudice prong. It specifically relates to the criminal conduct giving rise to the offense to which Reyes entered a plea of nolo contendere. The statement of facts read in support of the amended charge was as follows: “Pedro [Reyes] on or about the 5th day of October 1993 at Central Falls in the County of Providence did maintain a narcotics nuisance in violation of the Rhode Island General Laws.” It. is clear that the amended charge arose from his arrest and prosecution for the acts that gave rise to the two counts of the criminal information. Because the Cepeda statement concerns — and purports to absolve Reyes from — that conduct, it is relevant to the amended charge.[12]
. The Cepeda statement creates a genuine issue of fact as to whether at least one of Reyes’s codefendants in the 1994 case gave exculpatory testimony — during a bail hearing or elsewhere — of which trial counsel knew or should have known. Maybe Cepeda did so testify. Maybe trial counsel discussed this circumstance with Cepeda and his client. Maybe the state amended the charges because of this circumstance. Postconviction counsel’s investigation indicated that the alleged exculpatory bail-hearing testimony did not exist. However, the Cepeda statement, although it does not specifically mention bail-hearing testimony, indicates that Cepeda gave testimony at a judicial proceeding that tended to exculpate Reyes from the charged offenses. Therefore, at the time that Reyes’s application was summarily dis *673 missed, there was a genuine issue of fact as to whether Cepeda provided exculpatory evidence. .See Bucci v. Hurd Buick Pontiac GMC Truck, LLC, 85 A.3d 1160, 1175 n. 7 (R.I.2014) (“A ‘genuine’ issue is one that could be resolved in favor of either party * * (quoting Calero-Cerezo v. United States Department of Justice, 355 F.3d 6, 19 (1st Cir.2004))).
This genuine issue concerned a fact that is, at least at this early juncture, material to. the prejudice inquiry. If the exculpatory testimony exists, it bears on. the question of whether, if Reyes had proceeded to trial on the original charges, he would have been acquitted. From my review of the record, it appears that the only evidence linking Reyes to the charged offenses was Carl Barovier’s eyewitness identification of Reyes as the driver of the Datsun from which Cepeda emerged with heroin. There is no indication from the police reports that accompanied the criminal information that the driver ever exited the vehicle, nor is there information about the length of time that and the distance from which Barovier observed the driver, the lighting, his degree of certainty, or the time that elapsed before Barovier identified Reyes. Moreover, Barovier did not identify Reyes from a photo lineup; instead, when Edward Randall (Randall) provided Barovier a show-up photograph of Reyes — which Randall had selected based on Barovier’s description of the driver as having “light[-]black skin” and appearing to be “approximately 5'8" tall [and] between 19 and 23 years of age”— Barovier identified him as the man he saw driving the vehicle.[13] Contrary to the account that Barovier provided in the police reports, however, the Cepeda statement indicated’that Reyes was not involved in the drug deal in question. In particular, the Cepeda statement asserts that Cepeda testified that he and Reyes did not engage in drug transactions with one another as a general matter and that Reyes was not with him when he sold the heroin to Baro-vier. Therefore, because the Cepeda statement tended to discredit the accuracy of Baroviet’s identification1 of Reyes, the existence of Cepeda’s exculpatory testimony is a material fact that potentially bears oh the resolution of the question of whether, had Reyes gone to trial, “the outcome of the trial would have been different.” Neufville, 13 A.3d at 611; see Bucci, 85 A.3d at 1175 n. 7 (“[A] ‘material fact’ is one that has the potential of affecting the outcome of the ease.” (quoting Calero-Cerezo, 355 F.3d at 19)).
Finally, I acknowledge that, even if Cepeda’s exculpatory testimony does exist, the prejudice prong of the Strickland standard would not necessarily be resolved in Reyes’s favor. To the contrary, several additional factors would first need to be considered, including an assessment of the circumstances under which the testimony was provided, Cepeda’s credibility (or lack thereof), and the strength óf the state’s evidence against Reyes. In the end, Reyes would bear the burden of demon- *674 strafing the requisite prejudice.[14] See Strickland, 466 U.S. at 693, 104 S.Ct. 2052. But the genuine issue of material fact as to whether Cepeda provided excplpatory testimony — as well as the additional considerations that flow from the resolution of that issue — cannot and should not be resolved at the summary-dismissal stage. See Doyle v. State, 122 R.I. 590, 594, 411 A.2d 907, 909 (1980); Palmigiano v. State, 120 R.I. 402, 406-07, 387 A.2d 1382, 1385 (1978).
Because this record demonstrates the existence of a genuine issue of material fact about the question of exculpatory testimony and because the resolution of that question could impact the resolution of the prejudice prong, summary dismissal under § 10-9.1-6(c) on the basis that Reyes failed to establish prejudice was, under the terms of that statute, impermissible.
Conclusion
For all of these reasons, I would vacate the hearing justice’s summary dismissal of Reyes’s claims of ineffective assistance of counsel. It is my opinion that the hearing justice erred in granting postconviction counsel’s motion to withdraw and that Reyes did not receive the assistance of counsel to which he was statutorily entitled. That alone warrants a remand for further proceedings. Moreover, the majority improperly concludes that the hear-mg justice was precluded from considering the Cepeda statement, which was undeniably relevant to Reyes’s claims. The upshot of the majority’s decision is that Reyes will not receive full consideration of the merits of the claimed violations of his fundamental constitutional right. Although Reyes may look to a more hospitable forum for adjudication of this claim, see Martinez, 132 S.Ct. at 1318, 1320, the merits should have been adjudicated in this jurisdiction. Instead, the one-two punch of the Shatney procedure, followed by an artificial application of this Court’s summary-judgment standard to a document that was not submitted in opposition to a summary-dismissal motion, has rendered the postconviction remedy a nullity in this case. Consequently, I respectfully dissent.
APPENDIX
WITNESS STATEMENT
TIME: 1:00 pm
DATE: 12-9-13
PLACE: 215 Broadway Providence, RI
PHONE: 401 475-7497
I, Ismael Cepeda, voluntarily, without threats or promises, make the following statement:
*675 Q: What is your name?
A: Ismael Cepeda
Q: What is your present address?
A: Pawtucket,
Rhode Island
Q: What is your date of birth:
A: 11-24-72
Q: What is your occupation?
Á: Un-employed
Q: Ismael, tell me what happened that day in December 1993 when suspected heroin was purchased at the corner of Illinois and Summer Streets in Central Falls, RI?
A: Basically, easy man, I got arrested, I got charged, I ended up doing time, all of a sudden they came up with this one charge that has to do with him, Pedro, so I’m like, okay, they were trying to say that I made a deal with him or something like that which is a lie, I didn’t mind going to court on it because I never dealt with Pedro. Me and Pedro was never cool like that, I was never in his car, he was never in my cars so we never had the kind of deal as far as me and him going somewhere to make a deal, so undercover were trying to say that me and Pedro went once, I think it a brick of dope and then Pedro was with me in the car, we turned around, and that he got Pedro which was a lie so basically I went to court, got on the stand, swore on the bible that I was going to say the truth and they asked me basically, it was a five minute thing. They asked me a few questions. They ■said, do you see the guy that you know, there was undercover, and right away, I actually say, if I saw him, I would know who he is after all these years later. And I pointed at him and I just said basically that he was lying, that I would never deal with, you know, I knew Pedro from around the way, that I knew him because he was from the same town where I was from and yeah, we did see each other at the clubs, and scenes like that but never, everything I admitted to, I said I did all my deals, I did them, I admit to all that, but I can’t admit to something that I didn’t do and I told them straight up I never dealt with this guy, me and this guy never hung in the car together, we never, you know, the times I sold to the undercover, I never sold with Pedro in the car with me, and basically that was it.
Q: Who was this, the AG strike force?
A: Yeah, I think so, yeah.
Q: Yeah, it was the AG strike force. So basically you had no dealings with,
A: No, never, Pedro was somebody like I said, C F is only so small, and we had our own little click, we did all the deals that we did and everything else that I already pled to and I did time for, everything did happen but as far as me and Pedro goes, we never, never, whatever they were trying to say about me being in the car, and went to see the undercover and sold to the undercover, that I got out of the car and Pedro stayed in the car, that’s a he. I don’t know how they came up about that but I never, never and I will say it to this day, I never, me and Pedro never, I don’t think me and Pedro ever got into the car together. We seen each other, yeah, he probably got out of the car once or twice in the corner where we used to hang at but it was nothing like me and him being up and down the streets and hanging, we never did that.
*676 Q: Do you still live in Pawtucket?
A: Do I?
Q: Yeah.1
A: Yeah. I was at the medium one back them and his lawyer went up to me .and, I didn’t even know who he was but.he told me. the same thing you’re telling, me that how they were trying to put Pedro with me and I said yes, .I’m willing to go to court, I went to court and I did the fayor for. him. Right now, I wouldn’t mind doing the same thing, are .they, bringing him back to court?
Q:1 We’re trying to find out what’s going on with his case.
A:. Basically, that undercover lied. Pe- > • dro never got out of the car, we never made it there together, like I said, I know him, yeah, but because he’s from around the way. Whatever I did, I did on my own. He had nothing to do with anything I did back then.
Q: Okay, that’s about it?
A: Like I said, when I went to court, it was a five minute thing. It was quick; They just wanted to make sure that' I knew whát undercover was, who was saying all these things, I called him a bar right on the stand. I said that guy right there is lying. I pointed my finger at him, I said undercover right there, and he’s a liar. Me and this guy never did anything together.
Q: Do you .remember who the undercover was?
A: I remember the face, the name, its been too long, I don’t know. But like if I saw him at Walmart, I would know the face. He took years away from me, I 'got sentenced to two years on that, I know who he was. I met him a few times. I think I had six deliveries and all that. He was somebody that would go to the corner and, he would go there with $500 to buy one brick, like who does that, you know. We were happy to see money. That’s why he got so many people on that. He used to be one of the best customers coming over, ' undercover, you know, he was really doing the buys, paying top dollar for everything, so he got me and ten of my other friends.
Q: Okay, that’s it for now.
A: You can always reach me. I’m al- ; ways around.
Q: Okay, bye bye.
CONTINUATION WITNESS STATEMENT SHEET SIGNATURE PAGE
I SWEAR THAT THE STATEMENT I JUST GAVE WAS THE TRUTH TO THE BEST OF MY KNOWLEDGE AND GIVEN WITHOUT ANY THREATS OR PROMISES.
RECORDED OVER TELEPHONE WITNESS SIGNATURE
SUBSCRIBED AND SWORN TO BEFORE ME THIS 10th DAY OF DECEMBER, 2013.
/»/■ Nicholas Cardarelli
NOTARY PUBLIC
COMMISSION EXPIRATION EXPIRES ON 5129117

. I note that I am not convinced that the trial justice properly concluded that there was a sufficient factual basis for the plea — a requirement of Rule 11 of the Superior Court Rules of Criminal Procedure. However, Reyes’s argument on appeal focused exclusively on the trial justice’s failure to appoint an interpreter sua sponte. Apart from one sentence in his show-cause statement in which he asserted "there is neither a discussion of Mr. Reyes’[s] role in the aprended charge of maintaining a narcotics nuisance, nor of his understanding of that charge,” the entirety of his argument on appeal concerns the failure to appoint an interpreter. In my opinion, this single sentence fails to adequately develop — and, therefore, preserve for this Court’s review — any argument concerning the lack of factual basis for the plea. See McMahon v. Deutsche Bank National Trust Co., 131 A.3d 175, 176-77 (R.I.2016) (mem.); see also United States v. Zannino, 895 F.2d 1, 17 (1st Cir.1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossa-ture for the argument, and put flesh on its bones. * * * '[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.’ ” (quoting *662 Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir.1988))).

. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

. A copy of the Cepeda statement is appended to this opinion. The notary seal is visible in a copy of the statement in the lower-court file,

. A narrow exception to this general rule exists where the claim is based on a "specific, reviewable ruling” by the trial justice. State *663 v. Pineda, 13 A.3d 623, 635 (R.I.2011). It is the rare case in which this exception applies.

. During one of the hearings in this case, the following exchange transpired between the hearing justice and Reyes:
*664 “[THE COURT:] * * ⅜ Now, sir, I also have to note that you are doing a life sentence for a separate offense.
“THE DEFENDANT: Yes.
"THE COURT: Why are we going through this exercise?
"THE DEFENDANT; Based on this case, I got a different sentence in the other case, habitual.
“THE COURT: But you’re still doing two life sentences.”
The length of the sentences that Reyes may have received in other, unrelated cases was, of course, utterly irrelevant to the merits of Reyes’s claims of ineffective assistance of counsel. These claimed violations of Reyes’s fundamental constitutional right warranted careful consideration.

. As a member of the Shatney Court, I can state with confidence that " ‘[t]he matter does not appear to me now as it appears to have appeared to me then.' ” McGrath v. Kristensen, 340 U.S. 162, 178, 71 S.Ct. 224, 95 L.Ed. 173 (1950) (Jackson, J., concurring).

. Following the majority's lead, I refer to the attorney who represented Reyes in connection with his 1994 plea of nolo contendere as "trial counsel/’ and the attorney' who purported to represent him in connection with his PCR application as "postconviction counsel.”

. These are not merely isolated passages in postconviction counsel’s no-merit memorandum. Rather, the notion that trial counsel must have rendered effective assistance of counsel is a theme that permeates the entirety of the memorandum. See, e.g„ Postconviction Counsel’s No-Merit Memorandum at 25 ("[Reyes] was represented by very competent defense counsel who obviously did not feel that the services of an interpreter were necessary in order for his client to understand the plea colloquy with the [c]ourt.” (emphasis added)); id. at 15 ("Reyes has not presented any evidence to prove that his attorney acted in anything other than a competent manner.’’); id. at 19 ("In and [of] itselff, trial counsel's failure to file a pretrial discovery motion] does not mean that counsel was anything less than diligent in his representation of [Reyes]; there are many reasons why counsel might elect not to file for discovery. In many cases, it is because counsel might not want to file an Answer to the State’s Motion for Reciprocal Discovery, thereby having to give to the [s]tate any evidence that they might not want to divulge.” (emphases added)); id. at 9 ("I should point out that the defense counsel in this case was, and is, a very experienced and respected member of the defense bar who has represented hundreds of criminal defendants in all levels of the judicial system, both [s]tate and [flederal. He enjoys a well-deserved reputation as a hard[ jworldng, top-notch criminal defense attorney who is not afraid to try a case in front of a jury.”); id. at 28 ("It is difficult to second guess the work of an attorney when there was a negotiated plea.”).

. In fact, to the extent that the state intended to make such an argument, its attempt to do so was wholly ineffectual to preserve the argument for our review. Perhaps in light of its failure to preserve the argument that the Cepeda statement could not be considered by the hearing justice, the state on appeal simply highlights in a footnote the infirmities of the Cepeda statement that were noted by the hearing justice. To its credit, the state does not attempt to revive an argument that was not clearly and distinctly made below. The majority is raising sua sponte a ground of decision that was not addressed in the Superi- or Court. In my opinion, it is not the function of this Court to launch a rescue mission to resurrect an argument that was abandoned in the proceedings below.

. The majority concedes that the Cepeda statement’s infirmities are the result "of the notary’s disregard for his duties.”

. The majority charges me with "sug-gestfing] that we turn both our existing post-conviction relief case law and [G.L.1956] § 10-9.1-6(c) on its head” and that "the system should bend over backwards for an applicant” in the circumstances of this case. In my opinion, postconviction counsel did not comply with § 10-9.1-5. Under "our existing [PCR] case law,” it was reversible error to . , enter a summary dismissal before- Reyes received the assistance of counsel to which he was statutorily entitled. See Campbell v. State, 56 A.3d 448, 458-62 (R.I.2012). To the extent that the system permits the summary dismissal of the ineffective-assistance-of-counsel claims of a first-time, pro se applicant who has been deprived of counsel and who nonetheless comes forward with evidence suggesting actual innocence, the system is broken. It , .should bend backwards, forwards, and every other conceivable way so that the applicant receives his day in court. To hold otherwise turns the postconviction remedy enacted by the General Assembly into an illusion.

. I also note that, even if the Cepeda statement related only to the original charges, it would still be relevant to the prejudice inquiry. In the plea context, the prejudice prong requires a defendant to " ‘demonstrate a reasonable probability that[,] but for counsel’s errors, he or she would not have pleaded guilty [or nolo contendere] and would have insisted on going to trial’ and, importantly, that the outcome of the trial would have been different.” Neufville v. State, 13 A.3d 607, 610-11 (R.I.2011) (quoting State v. Figueroa, 639 A.2d 495, 500 (R.I.1994)); see also Lopes v. State, 111 A.3d 344, 349 (R.I.2015). If trial counsel .had advised Reyes not to enter his plea because of the exculpatory testimony of his codefendants, as Reyes alleges should have been done, and Reyes followed this advice, he presumably would have gone to trial on the original charges.

. Recently, this Court recognized "the problematic nature of eyewitness identification and its potential for misidentification,” State v. Davis, 131 A.3d 679, 696 (R.I.2016), and “the growing concern in other jurisdictions with reliance on eyewitness identification testimony, the growing body of scientific and psychological studies regarding the questionable accuracy of the accounts of eyewitnesses, and the efforts made to prevent a miscarriage of justice,” id. at 696 n, 13. We therefore announced that, henceforth, "the better practice would be for courts to provide the jury with more comprehensive instructions when eyewitness testimony is an issue, similar, for example, to those that were imparted in [State v.] Austin, 114 A.3d [87,] 92-93 [(R.I.2015),] and [State v.] Figuereo, 31 A.3d [1283,] 1290-91 [(R.I.2011)].” Davis, 131 A.3d at 697.

. Even if Reyes were able to demonstrate prejudice under Strickland, he would still need to meet the performance prong to obtain postconviction relief. Additional questions would arise before trial counsel’s performance could be deemed, defícjent, such as whether trial counsel knew or should have known of the existence of the exculpatory testimony, cf. Neufville, 13 A.3d at 611-12 (affirming the hearing justice's rejection of the applicant’s claim that his trial counsel was ineffective because he failed to interview potential defense witnesses where, after an evidentiary hearing, the hearing justice sup-portably credited trial counsel’s testimony that the applicant never disclosed any potential witnesses over the applicant’s contrary testimony), and, if trial counsel had such actual or constructive knowledge, whether it was constitutionally deficient to nonetheless advise Reyes to accept the state’s generous plea offer. Because the trial justice did not consider the performance prong and because the genuine issue of material fact as to whether the exculpatory testimony existed must be resolved before these additional questions can be answered, Reyes's claims cannot be summarily dismissed on the basis of an inability to satisfy the performance prong.